CHARLES BARNARD, ABEL ADAMS, GEORGE M. BARNARD, AND CHARLES LARKIN, PLAINTIFFS IN ERROR, *v.* JOSEPH ADAMS, ANDREW H. BENNET, AND JOSEPH FLETCHER.

It was a proper case for contribution in general average for the loss of a vessel where there was an imminent peril of being driven on a rocky and dangerous part of the coast, when the vessel would have been inevitably wrecked, with loss of ship, cargo, and crew, and this immediate peril was avoided by voluntarily stranding the vessel on a less rocky and dangerous part of the coast, whereby the cargo and crew were saved uninjured.

The cases upon this subject examined.

Where the cargo was taken out of the stranded vessel, placed in another one, and the voyage thus continued to the home port, the contribution should be assessed on the value of the cargo at the home port.

The crew were entitled to wages after the ship was stranded, while they were employed in the saving of the cargo.

A commission of two and one half per cent. was properly allowed for collecting the general average. It rests upon the usage and custom of merchants and average brokers.

THIS was a writ of error to the Circuit Court of the United States for the Southern District of New York.

The defendants in error brought an action in the court below to recover contribution in general average, on account of the alleged voluntary stranding of the ship Brutus owned by them, from the plaintiffs in error, as owners of twenty bales of nutria skins, which formed a part of her cargo at the time of the stranding.

The facts are minutely stated in the opinion of the court.

The cause was argued orally by *Mr. Boardman*, for the plaintiffs in error, and printed arguments were submitted by *Mr. Webster*, for the plaintiffs in error, and *Mr. Lord*, for the defendants in error.

*Mr. Boardman*, for the plaintiffs in error.

First Point. When the stranding of a vessel is inevitable, and her master, in the ordinary exercise of his duty as a navigator, directs her course to that part of the shore which he supposes to be the safest for the vessel, such act of the master does not render the stranding a voluntary sacrifice, or entitle the ship-owner to contribution from the owners of the cargo in general average.

I. The following authorities may be cited in support of the judgment below, but they do not sustain it. Columbian Ins. Co, *v.* Ashby, 13 Peters, 337; Sims *v.* Gurney, 4 Binney, 513; Reynolds *v.* Ocean Ins. Co., 22 Pick. 191.

II. The following authorities fully sustain the plaintiffs in error on this point. Taylor *v.* Curtis, 1 Holt's Nisi Prius

Cases, 192, note; 3 Eng. Com. Law Rep. 69; Walker v. U. States Ins. Co., 11 Serg. & Rawle, 61; Meech et al. v. Robinson, 4 Wharton, 360; Scudder v. Bradford, 14 Pick. 14; Abbott on Shipping, Perkins's ed., 490 and notes; Ib. 480; 2 Phillips on Insurance, 98.

III. The only voluntary sacrifice made was in the slipping of the ends of the chains. Walker v. U. States Ins. Co., 11 Serg. & Rawle, 66; Nickerson v. Tyson, 8 Mass. 467.

Second Point. The cargo, if chargeable at all, should have contributed according to its value at Buenos Ayres. Spafford v. Dodge, 14 Mass. 79; Mutual Safety Co. v. Cargo of the George, 3 N. Y. Legal Observer, 262, and 8 Law Reporter, 361; Tudor v. Macomber, 14 Pick. 38; 3 Kent's Com. 242; Abbott on Shipping, Perkins's ed., 504, notes.

I. The enterprise was terminated, and the affreightment dissolved, by the loss of the Brutus, before commencing the intended voyage. Dunnet v. Tomhagen, 3 Johns. 156; The Saratoga, 2 Gallison, 178, note 23, cases cited; Scott v. Libby, 2 Johns. 340; Purvis v. Tunno, 2 Bay, 492.

II. The power of the master to reship the cargo, and thus to continue the enterprise, extends only to cases where the ship is lost or disabled in the course of the voyage. Shipton v. Thornton, 9 Adolph. & Ellis, 337; Jordan v. Warren Ins. Co., 1 Story, 342; 3 Kent's Com. 210; Searle v. Scovell, 4 Johns. Ch. 223; Treadwell v. Union Ins. Co., 6 Cowen, 274; Saltus v. Ocean Ins. Co., 12 Johns. 112.

III. Buenos Ayres being the place of valuation, the jerked beef should have been included among the paying articles, according to its value at that place.

Third Point. The owners of the Brutus were not entitled to the wages and expenses of their master and crew for any time after it was ascertained that she could not be got afloat.

Fourth Point. The charge of two and one half per cent. as commissions or compensation to the plaintiffs, for collecting the contributions due to themselves, ought not to have been allowed.

First Point. The first question in this case is of the highest importance in point of principle. The error of the judgment under review seems self-evident. It is indeed a paradox. It amounts to this: that if a navigator, whose ship is inevitably doomed to loss by stranding, should consult his own judgment, and select, for his compulsory voyage to the shore, the route least perilous for himself and his vessel, such preference for the safer course is the incurring of a voluntary sacrifice, which entitles him to compensation.

Or it may be stated in this way: a mariner, whose ship is thus inevitably doomed, cannot avoid becoming entitled to contribution in general average, unless he blindly forbears all action whatever, or navigates with an express view and purpose to effect the destruction of the adventure. Neither reason nor authority affords support to this extraordinary doctrine.

" General average is founded on the simple principle of natural justice, that where two or more parties are concerned in a common sea risk, and one of them makes a sacrifice for the common safety, the loss shall be assessed upon all, in proportion to the share of each in the adventure; and the greater sacrifice of the first shall be compensated by the contribution of the others." Taylor *v.* Curtis, 1 Holt's N. P. Cas. 192, note. 3 Eng. Com. Law Rep. 69. Its origin is commonly traced to the Rhodian law *de jactu,* which named only the case of a jettison; and, although the rule is not to be considered as thus limited, yet the case there put is an apt illustration, and no case essentially different from this illustration can fairly be considered within the rule. Goods cast overboard in a storm to lighten the vessel, masts, spars, or rigging cut away to prevent her being driven ashore, or carried away in an effort to avoid, by some unusual means, an impending calamity, running a ship on shore to avoid capture, slipping a cable or an anchor for general safety, are the usual instances found in adjudged cases. Perkins's Abbott on Shipping, 480, notes. They are all within the illustration given in the Rhodian law; and, upon principles of natural justice, are proper cases for contribution.

But when a ship does no more than pursue that course of navigation which, independently of the good or evil thence resulting to cargo, is most safe for herself, how can she be said to encounter a peril or incur a loss for the benefit of her cargo? This is not answered by the precedents of allowance for parts of the ship or her tackle jettisoned for common benefit; because, although it might be proper to make such sacrifice for the benefit of the ship alone, were she empty, yet the act is the separation and destruction of a part for the benefit of the community of interests which still remain as such contending against the common danger. Not so, when the ship is run ashore as the safest direction which can be given to her; then the whole community goes together, taking the same direction and encountering the same peril. It is a mere accidental result, that the ship suffers more than the cargo.

The Brutus was not voluntarily sacrificed. On the contrary, she was lost by the direct and unavoidable operation of a *vis major*, unaided by any volition of mind or agency of man. The gale commenced on the 8th of October, at 4 A. M., and contin-

ued through that day and until the evening of the next, when it blew a hurricane. At 9 o'clock the best bower chain broke, and at 10 the small bower gave way. The vessel was then at the mercy of the elements. There was no possibility of avoiding a stranding. The mate who had the command of the vessel says especially that it was impossible to avoid going ashore, and that all he did was to make sail for and reach a place where she could be stranded with the chance of the least damage. To say that there was a voluntary stranding is an absurdity; as well might it be said that a man who jumps overboard from a burning vessel, and is drowned in the attempt to reach the shore, voluntarily drowns himself. The case admitted of no alternative.

It is a rule, that the mind of man must concur in producing the injury which shall entitle a party to compensation in general average. Here the mind operated only to diminish the sacrifice as much as practicable, and not to produce it.

It is well remarked in the note to Holt's Nisi Prius Reports before referred to, that " there are some cases on the subject of general average in the reports, but there is not much to be collected from them. The safest guide is principle, well studied and understood." 3 Com. Law Rep. 70.

Some of the cases, however, may be looked into with advantage. The Supreme Court of New York, by Kent, Ch. J., in Bradhurst *v.* The Columbian Ins. Co., 9 Johns. 14, decided, that, if the ship be wholly lost by the act of running her ashore, compensation in general average can never be due to the owners, or, as it has been technically expressed, that in all cases of stranding, the *salva navi* is indispensable to a recovery. 13 Peters, 334. This decision was made in 1812. It gave rise to much discussion. Mr. Justice Story, in his note to page 349 of the fourth American edition of Abbott on Shipping, took ground against the doctrine of Kent.

This *questio vexata*, with the great name of Kent upon one side and the equally great or greater authority of Story on the other, was not brought to a final test until the case of the Hope was decided in 1839. Columbian Ins. Co. *v.* Ashby, 13 Peters, 342. On that occasion Mr. Justice Story, in a very able and convincing judgment, definitively overruled the opinion of the great commentator upon American law. That judgment will be much relied upon as an authority for the plaintiff. Yet nothing was decided, except that neither the *salva navi*, nor a prior consultation by the master with his officers and crew, was necessary. Nothing else was discussed by counsel, or adjudged in the opinion. The Hope, though in imminent peril, and not securely moored, was still afloat, and held by her

anchors, when the master, for the preservation of vessel and cargo, slipped his cables, and ran her on shore (p. 332). The court (p. 337) treat the voluntary stranding as expressly found by the special verdict, as indeed it was. Nor could it be doubted from the facts found; i. e. that she was still held by her anchors, and might possibly have survived the storm, when he voluntarily slipped her cables (thereby relinquishing her existing means of keeping afloat), and ran her on shore.

The case of the Hope being clearly irrelevant, there is to be found in the books but a single case which affords any support to the judgment below. That one case is Sims *v.* Gurney, 4 Binney, 513. It was as follows.

The ship Woodrop Sims encountered a storm in Delaware Bay, and when she was driving before the storm toward Egg Island flats, where she would have soon stranded, her pilot changed her course, and ran her ashore on Cape May, as the most convenient place to save the ship, crew, and property (p. 514).

It will be seen that these facts were very similar to the facts proved in the present case. The suit was by the ship-owners for general average. Judge Yeates tried the case. His charge is rather loosely stated. "He inclined to think it a case of general average throughout." (p. 516.)

The plaintiff had a verdict, and a motion was made for a new trial, upon the ground, among others, "that the verdict was against law, as the vessel's going ashore was not a voluntary act by the captain, pilot, or officers, but the inevitable consequence of the gale then blowing." And this point was most ably argued.

Chief Justice Tilghman said (p. 526), — " It seems, at first view, not very reasonable that contribution should be asked for damage occasioned by an act which, in fact, was for the benefit of the ship. But the law is certainly so, provided the act which occasioned the damage was conducive to the common safety."

For this " certainly," no authority is cited; and the remark is a little like Dr. Sangrado's candid acknowledgment, that the death of all who took his remedy would have raised in his mind a doubt of its efficacy, but that he *knew* it to be beneficial. " Upon the whole," says the learned judge, after a rambling and protracted argument, "it appears to me that it was a nice point on which the jury had to decide, but there is no sufficient cause for setting aside the verdict." (p. 527.)

Yeates, J. stated to the jury. " that, upon the facts as they were affected by the rule of law, his mind had been in a painful, dissatisfied state, during the trial "; and in reporting the

case to the court, he stated that " he could not say he was satisfied or dissatisfied with the verdict." (p. 516.)

A Mr. Tilghman, who argued the case for the plaintiff, put it that it was a question of fact for the jury (p. 524), and his namesake, the judge, seems to have adopted the argument (p. 527).

Yeates, J. (p. 527) puts it strongly on the same ground, and Brackenridge, J. simply concurs.

The facts were certainly more complicated in that case than in the present; and it may be, under all the circumstances, that it was a question of fact proper for the decision of a jury. There was, indeed, no exception or complaint of any error in the charge. (p. 516.)

1. In this view of the case, it may well be doubted whether any law point was decided in it, and it is certain Justices Yeates and Brackenridge so regarded it.

2. The singular opinion of Tilghman, Ch. J. is but slenderly sustained by its own reasoning, and is completely overruled by two cases in the same court, to which we will now refer.

In Walker *v.* U. States Ins. Co., 11 Serg. & Rawle, 61, A. D. 1824, the vessel was laboring in a storm, and wholly ungovernable, when the master put her helm hard up, and ran her ashore, in order to get her into the best place for the preservation of the lives of the crew, the vessel, and the cargo. (pp. 62, 65.)

The court, per Gibson, J., says, — " It is not enough that there be a deliberate intent to do an act which may or may not lead to a loss ; there must be a deliberate purpose to sacrifice the thing at all events, or, at the very least, to put it in a situation in which the danger of eventual destruction would be increased." Again, " Nor do I deem it of any importance that the master and crew thought their situation would, in any event, be bettered by the measures that were afterwards taken. Both are equally remote from a deliberate intention to sacrifice the ship, or to increase the risk of it ; and without that there can be no claim to general average."

True it is that in this case the court say that they leave Sims *v.* Gurney untouched. But they certainly overrule Tilghman's opinion.

In Meech *v.* Robinson, 4 Wharton, 361, A. D. 1839, the court, per Kennedy, J., after explaining Gurney *v.* Sims in a way which would divest it of all applicability to the present case, stating it to be a very questionable case, at best, and shaken, if not overruled, by Walker *v.* United States Ins. Co., 11 Serg. & Rawle, 61, just referred to, says, — " The running of the vessel ashore cannot with propriety be said to have been voluntary, nor can it, indeed, be well said that

the loss of the vessel was occasioned thereby.  For, according to the evidence of the master, which is all that we have, and all that the plaintiffs rely on to establish their claim, the vessel being on a lee shore where she could not carry sail, they found it necessary for the preservation of the lives of the crew, as the loss of the vessel was then certain beyond a doubt, being in four fathoms water and the land within a mile of her, to run her ashore, and accordingly they slipped the best bower anchor, put the vessel before the wind, and in a short time struck the land.  In his cross-examination he further states that her situation was most desperate, that she would have gone to the shore at all events, but the mode in which the witness ran her ashore saved the lives of the crew, and tended to save a great proportion of the cargo.  From this it is perfectly manifest, that the loss of the vessel had become inevitable as the consequence of a peril then present.  And in such a case, says Mr. Phillips, in his Treatise on Insurance, Vol. II. p. 98, when the acts of the crew are intended to alleviate, instead of avoiding, such consequence, it seems hardly to be voluntarily incurring a loss."

Mr. Benecke, in his work on Insurance (ch. 5, p. 219), in which, says Chief Justice Abbott, in his work (p. 343), "there is so much learning combined with practical experience meets the present case in so many words, and declares, that if the situation of the vessel were such as to admit of no alternative, so that, without running her ashore, she would have been unavoidably lost, and that measure was resorted to for the purpose of saving the lives or liberty of the crew, no contribution can take place, because nothing was in fact sacrificed."  "So here the plaintiffs suffered nothing; their vessel was doomed to inevitable destruction by the peril of the sea which surrounded her."  After some further observations and citations of like import, he adds, "The loss of the ship in question, appearing to have been inevitable, must therefore be borne by the plaintiffs, who were owners of her."  "This," says Mr. Stevens, "the Digest and all authors are agreed on ; for you cannot in equity convert a loss which is inevitable into a claim for the preservation of property."  Stevens and Benecke on Average, by Phillips, p. 84.

These cases not only overrule Sims *v.* Gurney, if it can be considered an authority against the defendants, but are directly adverse to the judgment now under review.  See also Scudder *v.* Bradford, 14 Pick. 14 ; Perkins's ed. of Abbott on Shipping, 490 and notes.

If the Brutus had been held by her anchors, and the mate had slipped his cables and run her on shore for the common

safety, a case of voluntary sacrifice might have been presented. There are several instances of such acts being held a ground for contribution. 13 Peters, 342; 22 Pick. 197.

But the Brutus, at the time of the alleged sacrifice, had been forced from her anchors by the elements, and was being driven towards the shore by an irresistible force. The pilot, it is true, remained at the helm; and, being there, he used his judgment in giving her the direction which not only was best for the whole adventure, but best for herself, which would have been best if she was empty. If this entitles the plaintiffs to recover, then, in every case of stranding, the owners of the vessel may be compensated in general average. Whenever the master is not asleep, insane, or, from some cause, grossly negligent of his duty, he will use his judgment, and control the helm, so as, in some degree, to modify the disaster which he cannot avert; and it will be strange if he cannot swear, as the mate did in the present case, that he did thus modify it for the common benefit. Under such a rule, the presence of the master and crew will be absolutely detrimental to the cargo in most cases of stranding. Their being on board will only serve to lessen the injury of the ship, and to create in her favor a claim against the cargo.

The case of Cutler *v.* Rae, reported as dismissed for want of jurisdiction, in 7 Howard, 729, was very ably argued on the merits by counsel. We copy a part of the argument. " In Sims *v.* Gurney, 4 Binney, Ch. J. Tilghman lost sight of the fact that the subject benefited, i. e. the ship, was the very subject calling for compensation on the pretence that it was sacrificed. When a master finds that his vessel must go on shore, and merely exerts himself to go in a safe place rather than in a dangerous one, he no more makes a sacrifice than when, in navigating his vessel on the sea, he chooses a safe channel rather than a hazardous one, or changes his course to avoid a rock or a shoal; he does his plain duty for the benefit of the ship as well as of the cargo, and to avoid loss and sacrifice of the ship, and not to produce them."

If, at the moment of giving the vessel her direction to the shore, the mate had been asked whether he intended to sacrifice the vessel for the benefit of the cargo, he certainly would have replied in the negative, and assured the querist that he was doing with the ship the best that could be done for the ship herself.

The only thing like a voluntary sacrifice, in the case, is the slipping of the ends of the chains. They impeded the management of the vessel, and were voluntarily jettisoned for the purpose of relieving her. 11 Serg. & Rawle, 66; 8 Mass. 467.

Second Point. The defendants' nutria skins and the jerked beef should have been estimated, for the purpose of contribution, at their value at Buenos Ayres.

1. The value of the nutria skins at Buenos Ayres was only $ 6,317.27.    At New York it was $ 11,000.

2. The value of the jerked beef at Buenos Ayres was $ 1,125.18.    At New York it was nothing.

It is admitted that, in ordinary cases of average, the rule of contributory value is the value at the port of destination.

This must necessarily be so ; because it is there that the adventure is terminated, and the deliverance, which forms the ground-work of the claim for contribution, is consummated. Besides, it is rarely possible to refer to any other market for a rule of estimation.    But if the vessel be wholly lost, and the adventure consequently terminated at a different place from the port of destination, the value of the goods at such different place is to be taken as the contributory value.    Perkins's Abbott on Shipping, 504, note 2.    The Supreme Court of Massachusetts uses the following language, per Jackson, J., in Spafford *v.* Dodge, 14 Mass. 79 : — " The contribution must be adjusted according to the value of the respective articles saved, at the time when the expenses were incurred, in like manner as if all parties had been present and each had originally paid his own proportion."

" If the contribution had been claimed for goods thrown overboard, or for a mast cut away, the adjustment of it would necessarily be postponed until the termination of the voyage ; because, until that event, it could not be known whether any thing would be saved from which to claim a contribution, and also because each party would be held to contribute according to the value of what should come to his hands, at the termination of the voyage."

See also Mutual Safety Co. *v.* Cargo of the George, 3 N. Y. Legal Observer, 262 ; Ibid., 8 Law Reporter, 361.

Tudor *v.* Macomber, 14 Pick. 38, was a case of average contribution for cargo jettisoned.    The vessel was driven ashore near her port of departure.    *Curia per* Putnam, J. : — " We think that, if the vessel arrives at the port of destination, the value should be the net price for which the cargo might have been sold there," citing Benecke and Abbott.    " That is undoubtedly the rule in Great Britain, France, Spain, and Prussia. Benecke, 288.    But, says the same auther, should a jettison take place so near the port of departure that the vessel returns to the same or to a neighboring port, the actual price of replacing the goods thrown overboard should be allowed ; or, if that could not be done, the cost price, including shipping charges and

Barnard et al. *v.* Adams et al.

premium of insurance." The question in this case arose upon the rule as to the goods jettisoned; but all the law writers put the goods lost and the goods saved on the same footing; and strenuously maintain that the valuation of each should be made upon the same principles. See Kent and Abbott at the pages cited. Kent (Vol. III. p. 242) says, " The contributory value, if the vessel arrives at the port of destination, is the value of the goods there." Abbott (Perkins's ed., p. 504) lays down the rule of value at the port of destination with precisely the same qualification.

We do not mean to contend, that, in ascertaining the value of the goods, the arrival of the vessel at the place of valuation is the essential point. But we say; that these authorities point to the place where the adventure terminates, as being the port of deliverance, and the place where the compensation for effecting that deliverance first becomes due, and where, of course, it is to be measured. When goods saved from shipwreck and chargeable for contribution first reach an intermediate port, and are there accepted by an agent of the shipper, as they may be, they must be valued at that place.

If they are not so accepted, the owner first becomes chargeable whenever, and, it may be safely affirmed, wherever, they so reach his hands. But when the voyage is strangled in its inception, there is no port referable to but the home port of the shipper. Destruction of the vessel there necessarily leads to a return of the cargo into the hands of the shipper. If, permissively, or by express retainer, the master of the disabled ship hires another vessel, transships the cargo, and carries it to the port of original destination, this is a new adventure, voyage, and agency. There is no pretence that an insurance upon these goods on board the Brutus, " at and from Buenos Ayres to New York," would have covered them during their voyage on board the Serene.

The voyage being prevented by the loss of the vessel, before her departure, the insurer would be responsible, under the first word, for the damage incurred by the wreck of the Brutus, but there his risk would end.

In the present case, the vessel was wholly lost. This terminated the enterprise, dissolved the contract between the freighters and the ship-owners, deprived the latter of all claim for freight, and entitled the former to receive their goods. All this occurred at Buenos Ayres. Dunnett *v.* Tomhagen, 3 Johns. 156 ; The Saratoga, 2 Gallison, 178, note 23, and cases cited ; Scott *v.* Libby and others, 2 Johns. 340.

The claim to average was consequently perfect at Buenos Ayres. It was then and there recoverable. It was of course

then and there ascertainable. A libel *in rem* in' the Admiralty Court of that country would have been an appropriate means of enforcing the claim.

Upon what ground, then, is it that the settlement is transfer-. red to New York, and the goods made to contribute according to their value there ? It is said that, if a vessel by misadventure is disabled from prosecuting her voyage, it is the duty of the master to transship the goods, and cause them to be carried to the port of destination.

That may be proper where the disaster occurs in the course of the voyage. But if it occurs before the sailing, and at the very port where the goods were received, the contract of affreightment is at once dissolved. Purvis *v.* Tunno, 2 Bay, 492.

In this latter case, which is the case before the court, there is no necessity of vesting the master with the extraordinary powers which, by the maritime law, he becomes clothed with, when, at a distant intermediate port, in the absence of all concerned, he becomes, *ex necessitate rei,* agent for whomsoever it may concern, ship-owner, freighter, insurer, &c. Shipton *v.* Thornton, 9 Adolph. & Ellis, 337 ; Jordan *v.* Warren Ins. Co., 1 Story, 342.

At the home port of the freighter, the choice of another vessel properly devolves upon the freighter. After the freighter has bargained for the carriage of his goods in a chosen vessel, the ship-owner cannot insist upon forwarding the goods by another vessel, merely because the first has become incapable of commencing the carriage. In that event, the freighter has the right of making a new choice for himself.

The cases on the authority of the master to transship all, expressly or impliedly, confine it to a port of necessity, after the ship, in the course of the voyage, has become disabled. 3 Kent's Com. 210 ; Searle *v.* Scovell, 4 Johns. Ch. 223 ; Saltus *v.* Ocean Ins. Co., 12 Johns. 112 ; Treadwell *v.* Union Ins. Co., 6 Cowen, 274.

The rule of contributory value adopted below assumes New York to be the port of deliverance from the peril ; it supposes that, if the goods had been lost in the Serene, the defendants would have been exonerated from all claim for contribution ; yet most clearly that is not so.

When, at the port of reception, before the receiving ship has weighed anchor, or commenced her voyage, she is lost, we insist that the adventure, and all relations between the parties thereto, must, then and there, close. All accounts between them touching the intended voyage — attempted, but never even begun — must, then and there, be adjusted.

The rule for which we contend has a twofold operation for the relief of the defendants in the present case ; the rule adopted below had a twofold operation against them. Their nutria skins have been made to contribute on a value increased 70 per cent. by the carriage to New York, in the Serene ; the jerked beef, which was worth nearly $ 1200 at Buenos Ayres, is relieved from all claim for contribution.

This last proposition is clearly not maintainable. The jerked beef belonged to one of the plaintiffs. He received it from the Brutus in good order, at Buenos Ayres. We say in good order, because the judge in his charge assumes that there was no adequate proof of its having sustained any injury by the stranding of the vessel.

When the beef was thus returned to the shipper after the stranding, the judge assumes that it was uninjured, and of course worth about $ 1200. Still it is to contribute nothing, merely because the shipper was pleased to send it to New York, and it was lost on that voyage. He might have sold it or consumed it at Buenos Ayres, sent it to China, or disposed of it as he saw fit. In his hands, when delivered from danger by the so-called sacrifice of the Brutus, it was worth $ 1200, yet it shall contribute nothing, because the voyage on which the owner was pleased to ship it turned out unfortunately !

It is impossible to sustain this branch of the charge upon any principle. The common law of rustic arbitrators alone furnishes a precedent for the rule adopted in relation to the jerked beef. The court below "split the difference."

The acceptance of the nutria skins at New York by the defendants can have no effect. They had a right to receive their own property whenever it was tendered to them. By receiving it, they perhaps adopted and ratified the whole agency of accepting it in their behalf at Buenos Ayres, and shipping it in the Serene for New York. This probably made them liable for freight by the Serene. This they have paid, or are willing to pay, on demand. The mere acceptance of their own property cannot change their relations to the owners of, and other shippers by, the Brutus.

To conclude, we insist that the nutria skins should have contributed at the Buenos Ayrean value, and that the jerked beef should have been included among the subjects of contribution.

Third Point. The owners of the ship Brutus claim contribution for the loss of their vessel. It will not be denied, that the contracts between them and their master and crew were dissolved and terminated by the destruction of the vessel. The whole doctrine of abandonment to underwriters would fall to the ground, if this were not so. The moment the vessel was

24 *

wrecked and found innavigable, the crew were at liberty to leave her. The master could neither detain them, nor profitably employ them. Charges are made for the wages and expenses of both master and crew, long " after it was ascertained that the vessel could not be got afloat, and her sale was determined upon." But the court refused to instruct the jury that these charges were not recoverable. The error was manifest.

Fourth Point. — The allowance of two and a half per cent. to the plaintiffs, for collecting the contribution alleged to be due to them in general average, was erroneous.

The case assumes that the plaintiffs sacrificed their vessel for the common benefit. To ascertain the amount of their claim, and the proportions in which it is chargeable upon the freighters, an adjustment is made out at the cost of the contributors. Here it is supposed all expenses must cease, unless the taxable costs of a legal tribunal should become recoverable. There is no such thing known in the law as a fee or commission to a party for receiving his own demand.

This action of collection or reception is not done for the common benefit, nor for the benefit of the defendants. Surely the defendants, as owners of the nutria skins, are not interested in the collection, though they were in the adjustment. If the plaintiffs choose to omit the collection, no one will suffer but themselves. Upon general principles, it is perfectly absurd and unjust to demand from one not interested in the collecting, compensation for collecting a demand. Governments, by positive enactment, charge their debtors and tax-payers with the cost of collection. Positive law sometimes imposes costs upon a delinquent debtor, but no such penalty is imposed by the common law. There was no evidence at the trial of any usage of trade, general or local, sanctioning this exaction. We submit that it cannot be sustained.

*Mr. Lord*, for defendants in error.

The question on which this judgment rests is, whether, when a ship is in a peril so imminent that her total loss is inevitable, to all appearance, a voluntary stranding, made with a view of saving the ship and her cargo from total destruction, is to be contributed for, in the event of any thing being thereby saved? The plaintiffs in error treat this as an open question. They also insist, that, as the destruction was inevitable, the stranding could not be voluntary, in the sense of the rule; that the ship claimed for, instead of being sacrificed by exposure to the greater peril, was in fact submitted to the less; and that this was done in the course of ordinary duty, and so not an act of

sacrificing at all. These are the views presented in their first point, amplified by the considerations in their written argument. They are in opposition to the first point of·the defendants' brief, and will now be more fully considered.

The subject naturally divides itself into the inquiry, first, What is the nature of the peril, the avoiding of which by a voluntary damage gives rise to a contribution? and secondly, What is the character of the act of the master, which is to be deemed voluntary?

No question is made, and there is no difference pretended as to the right to contribution, whether the master's act has caused an absolute physical destruction of the ship, or a partial injury..

Then what is the nature of the· general average peril? On the part of the plaintiffs in error, it is said that it must not be of an inevitable kind. All their argument depends directly or indirectly on the loss in the present case being apparently. inevitable when the stranding was determined on; and from that they argue that the voyage to·the shore was compulsory; that all that man could do was to navigate the ship to a safer spot; that it is like jumping over from a burning ship; that the act of stranding saved the ship, rather than sacrificed her; and, from the loss being thus inevitable, he argues that in fact nothing was voluntarily lost, nothing is to be contributed for.

Let us then see what is a general average peril in the conceded instances of it. If the danger is not so great that loss is otherwise inevitable, where is the right of the master to anticipate or hasten the destruction of any part of the adventure? Does a master ever rightly make a jettison, cut away a mast, or run his ship ashore, unless the loss, at the time he resolves on the measure, is inevitable unless he resorts to it? Is the master to throw over cargo or mutilate his ship out of mere apprehension? Does he ever do it, unless all reasonable hope of otherwise·saving the adventure is gone? He is not to be justified in a fear from slight causes, nor in anticipating that total destruction to a part which awaits the whole adventure, unless to all human judgment safety from any other measure is hopeless. When the ship has been overcome in her struggle with ocean and ·tempest, and is in danger of foundering, and when lightening her is the only measure to avert this otherwise certain peril, then first arises the right to throw over cargo. It is a right only born at the last degree· of distress in his· ship. If it can be shown that the vessel was not in such danger· that she would in all human judgment sink unless relieved, the jettison would be unwarranted. So, too, in any case of voluntary stranding, if it could be shown that, by any

means in the master's power, by holding on to anchors, by making or pressing sail, he could avoid the danger, he is not warranted in beaching his ship. And so in fact is the practice of mariners. None of the cases of voluntary stranding which have occurred have been without inevitable danger.

The peril, therefore, being in its nature inevitable, so far from being a reason to prevent a contribution, is, on the contrary, essential to it. And the argument for the cargo here goes to the extent, that, when a slighter danger exists, the contribution shall be made, but not when a greater. And in this uncertainty, what becomes of the rule as a rule of law? Is it to be left to a jury to say, in this case the danger was a little less, and there shall be a contribution; and in that case the danger left no hope, and therefore there shall be none?

The greater the danger, and the more inevitable, by any other means than by measures to anticipate its action, the more justifiable is the act of courage thus anticipating it, and the more rightful the demand of contribution.

It will appear, by reference to the cases of the Woodrop Sims, 4 Binney, 513; the Apollo, 2 Serg. & Rawle, 229; the Julia, 2 Serg. & Rawle, 237, n.; 3 Wash. C. C. R. 298; the Gem, 22 Pick. 197; and the Hope, 13 Peters, 331, that in every case the loss was, to all human appearance, inevitable; and this is all which the strongest language of any witness can ever be rightly understood to mean.

As to this character of the peril, the acknowledged instances of general average contribution and the maritime authors alike unite. Thus, to save a ship from foundering, the jettison is contributed for; the loss was inevitable. To avoid capture, after flight or resistance has become desperate, a stranding is warranted and contributed for; the loss was inevitable. The ship is on her beam-ends and filling with water; her masts are cut away and contributed for; her loss was inevitable.

The language of Emerigon (Vol. I. p. 408) is very apposite to the case at bar:—" It sometimes happens that, to escape an enemy, or to avoid absolute wreck, the ship is stranded in the place which seems the least dangerous; the damage sustained on such occasion is general average, because it had for its object the common safety." And he adds: " The Acts of the Apostles (xxvii. 39) furnish a memorable example of a voluntary stranding." Showing, very clearly, his understanding that the loss to be averted was otherwise an inevitable loss. So, also, the ransom from pirates is to be contributed for; the loss is inevitable, and indeed actual.

Boulay Paty presents the same view:— " If, to avoid a total loss, by wreck or capture, the captain adopts the measure of

stranding his ship, the expenses to get her afloat are general average." (4 Boulay Paty, Droit. Marit. 454.) Again: "So that to constitute general average there must be a forced will (*il faut qu'il y ait volonté forcé*); that the act of man should concur with the accident (*cas fortuit*). . . . . . There must, in the next place, be the avoiding of an imminent peril (*periculum imminentis evitandi causa*). A panic fear would not excuse the captain; the danger must be real." Ibid. 257, 258.

It would seem, that, in the face of these considerations, the inevitable character of the danger should not take away the right to the contribution.

There is, however, another view of this subject worthy of consideration. What is the peril to be avoided? Take, for an instance, the case at bar. It was a total destruction of ship, cargo, and crew. Was this particular peril, the danger of this particular loss, inevitable? The result shows that it was not; for the ship, cargo, and crew did not thus perish. This fatal aspect of peril was capable of being averted, for it was in fact averted.

What was the new peril into which the disaster was shaped? It was a stranding on an easy beach, a saving of all the cargo undamaged, and the preservation of every life on board. Why, then, should the saved cargo insist that the peril was inevitable, — the peril from which, in fact, it has been delivered? What caused the substitution of the saving in place of the destroying peril? The coolness and deliberate courage of the officer in charge, advancing to attack the danger on the field chosen by himself, instead of awaiting its attack where it would have been irresistible.

It is proper to notice a result of this character of general average peril. Without the relief, the whole adventure must be looked upon as lost. It would be lost in case of the danger of foundering, of capture, of actual possession by pirates. All being thus viewed as lost, all is equally valueless; that is, the value of all the parts of the adventure is to be viewed as a value subject to the degree of danger, and diminished as that degree is great. And when a contribution is refused because the thing, whose loss is anticipated by the master's act, is already in danger of destruction, it is to be remembered that the things saved were in equal danger; that the contribution is not to be unfavorably viewed because of the value, in a place of safety, of what is not lost. The time of view for justice to take is when all was equally in danger. It therefore calls for a liberal construction in favor of the contribution. In this manner salvage awards are liberal, in proportion as the property saved was, previously to the saving, reduced in value

by the peril from which it was relieved. The contribution is said to be "the common law and justice of partnership." (1 Holt's N. P. Rep. 192, note.) It is a partnership of peril merely, a partnership of danger, from which every thing which escapes, by any anticipation of the danger, is a part of a stock treated as a common stock, and to be ratably divided.

What, then, is the character of the master's act which is to be deemed voluntary?

The expression of Boulay Paty above quoted is peculiarly accurate to describe it; it is "*volonté forcé*," a forced choice; that or none, to use a homely phrase. Again, he says, "the will of man must concur with the disaster," not be alone the cause, but only a coöperating cause. The idea that any of the sacrifices at sea, in times of peril, are voluntary in any ordinary sense of the word is quite erroneous. It is an act of the will, under the sternest pressure of necessity; the alternatives are, total loss if nothing is done, a lighter loss if the danger is hastened. This is all the choice. It is the only choice presented. It is to aid in making this determination that consultation is to be had. It is in this that the degree of peril becomes important to be considered. The greatness of the danger makes the task of adopting some measure of escape more imperative; to relieve the whole adventure from the danger of vacillating resolves, arising from hesitation to sacrifice ship or cargo, or parts of cargo, in preference one to another, the policy of the law interposes the indemnity of a general contribution. Tilghman, C. J., says: "The law of average is founded on policy and equity; on policy, because there are men who would risk the loss of life and fortune, rather than sacrifice their property without compensation. On equity, because nothing can be more reasonable than that the property saved should contribute to make good the loss which was the cause of safety." Gray *v.* Waln, 2 Serg. & Rawle, 255.

The voluntary act, then, is not to determine whether any thing shall be destroyed. Destruction is upon them already; all will be destroyed, as the circumstances stand, before the master acts to avert peril. Something must be destroyed at all events. The only volition to be exercised is, Shall the destruction be anticipated as to part, to procure the rescue of the rest? and when and how shall it be done? It is a mere election of time and selection of subject. There is no other volition, no other voluntary act. Refining criticism may waste itself in calling this a compulsory choice, a compulsory voyage to the shore, a selecting of a safer exposure, — in denying it to be a sacrifice. It is, nevertheless, all the voluntary act which remains to the master to perform. On its being performed with

coolness, courage, and discretion, the whole property and the lives of all depend; that this small amount of volition may be exercised freely and without hesitation, the policy of the law tenders to the officer the indemnity of a general contribution. It puts him at ease as to the result of his decision. This selection of time and place of stranding was made in this case at bar; the time was anticipated, the place varied. The two important items of choice were acted on, and the result was a saving of the life of every one, the saving of the cargo almost entirely, and greatly lessening the injury to the ship.

The criticism made on this part of the argument by the plaintiffs in error is more striking than just. They say, that it is a paradox to call placing the ship in a safer place of stranding a sacrifice. The putting of a cargo into lighters to relieve a stranded ship does the same; but it is a case of average contribution. And moreover, the sacrifice, so called by a figure of speech, in general average, is merely the anticipation of the time of probable injury, and the selection of the subject. Suppose the loss to which the ship was exposed had not been inevitable, so that, upon the principles of the plaintiff's argument, it was a case of contribution; would it be less so in any degree, if the act done for general benefit at the same time rendered the invited and anticipated damage more inconsiderable?

Nor is the remark just, that there "always will be a general contribution, unless the master blindly forbears all action." There will never be a contribution unless the master does take action to select time and place of avoiding a general impending destruction; but whenever he does, there ought to be contribution upon the principles of the law, however numerous be the instances. It is not always that the selection of time and place can be made; but whenever it can, it is policy that it should be, and that under a judgment freed from hesitancy by the indemnity of a contribution. The apparent force of this consideration of the plaintiffs is overbalanced by that of there never being any contribution at all, if the principle be adopted that, if the loss be otherwise inevitable, there can be no contribution. That tears out the whole of this branch of the law.

It is therefore respectfully submitted, that a deliberate selection of the time and place of stranding was a voluntary act within the rule of law.

That the act of the master only diminished the danger to the ship has already been considered. The whole apparent force of this argument grows out of the figurative use of the term *sacrifice*. Its meaning, in this branch of the law, we submit, has reference only to doing an act intentionally damaging;

it has no reference to the danger that was impending being greater than is willingly, and at an earlier period, incurred.

Again, to the argument that the ship, the subject benefited, was the very subject calling for compensation on the pretence that it was sacrificed, we answer, that it is no objection to a contribution that the ship is benefited as well as cargo. The contribution rests on the master's judgment in anticipating the effect of the danger by an earlier exposure to it.

It is said, too, that, in a case like the present, the master no more makes a sacrifice than when, in navigating his vessel on the sea, he chooses a safe channel rather than a hazardous one; the answer is, that the case of general average is not in the course of common navigation, but arises on conduct in circumstances of great danger, fear, and trial, calling for other considerations than the ordinary safe navigation; and that, in the case supposed of choosing a safer channel, no act of present and anticipated injury is incurred. Nothing but the strongest fancy can make an analogy between the cases.

A distinction is attempted between acts of jettison, cutting away parts, &c., on the ground that a separation of parts of a ship or cargo differs from an injury to the ship going as a whole community into a peril. This is not very easily to be understood; but if it means that there is any difference between a jettison and a voluntary stranding damaging the whole ship, on this ground alone, that an injury to a part differs from an injury to the whole, such difference is entirely denied, and is not supported by any authority nor acknowledged principle. In case of a voluntary stranding, it is not an accidental result that the ship suffers more than the cargo; but it is the very intent of the stranding.

One other view will be presented, on the principle of the judgment below. It has been suggested in a single case, that where the loss was inevitable, the thing sacrificed must be deemed of no value, and so there should be no contribution. The answer would be, the things saved at the time of the master's decision were equally of no value when the loss was inevitable. And when, having been redeemed from their peril by intentionally injuring that which was in the same and no more peril, an equal value should be restored to that. Under the peril impending, all were of no value; after the peril is removed, all stand of full value. The case referred to is Crockett v. Dodge, 3 Fairfield, 190. The schooner Rambler was taking in a cargo of lime at the wharf; it took fire; the hatches were closed, and thereby a part of the lime was saved; afterwards, the vessel was scuttled with a remnant of the lime on board, which was thus lost. For the loss of this remnant, a claim for

general contribution was made against the ship. The judge, before whom the trial was had, held that the lime in its endangered and damaged condition was of no value, and so no contribution should be recovered. The court above placed it more on the impossibility of its being saved. But, although decided in 1835, no reference was made to any of the cases on this question but 9 Johnson, and the very case is put by the court, in 13 Peters, 340, as one of general average.

Besides, it is not true that property greatly endangered is to be deemed valueless. If, in the apparently instant wreck, in which every thing is likely to be lost, a mariner should embezzle a box of jewels, would he be treated as appropriating a thing of no value? If the convict doomed to execution to-morrow on the gallows be stabbed to-night, will it cease to be murder, because he has but a short remnant of a doomed life?

Referring to the defendant's printed brief, as to the decision under review being supported by principle, this part of the argument will be closed by two quotations. Ch. J. Tilghman says, in his judgment in Sims *v.* Gurney, 4 Binney, 524:— " Nothing can be more equitable than that all should contribute towards the reparation of a loss which has been the cause of their safety; and nothing more politic, because it encourages the owner to throw away his property without hesitation in time of need." Judge Sewall, in Whitteridge *v.* Norris, 6 Mass. 131:—" General average is a contract by which distinct properties of several persons become exposed to a common peril, and a relief from that peril at the expense of one or more of the concerned, who are, therefore, entitled to contribution from the rest, provided the benefit was intended as well as obtained by the destruction, or at the peculiar hazard, of the property lost."

But is this question an open question in this court? The elaborate argument for the plaintiffs in error forbade passing by a discussion of the principle; but it seems impossible now to treat this case as not covered by authority.

In the Columbian Insurance Co. *v.* Ashby and Stribling, 13 Peters, 331, the brig Hope, sailing on a voyage to the West Indies from Baltimore, was overtaken by a gale in the Chesapeake; she anchored, drifted from her moorings by force of the gale, broke her windlass, parted her chain cables, and about midnight brought up near Crany Island; " she thumped or struck on the shoals on a bank, and her head, swinging around to the westward, brought her broadside to the wind and heavy sea; the captain, in this situation, finding no possible means of saving the vessel or cargo, and preserving the crew, slipped his cables and ran her ashore for the safety of the crew and preservation of the vessel and cargo"; it was found

impracticable to get her off.　All this was found by special ver-
dict.　The cause was heard in this court in January, 1839;
and after an elaborate argument and very learned opinion, this
stranding was adjudged to be a ground of general average con-
tribution.

The above description of the imminency of the peril and
means of relief is copied literally from the special verdict.　The
jury found no other peril, and no other stranding.　They ap-
plied not to the peril the term *inevitable*, nor to the stranding
the word *voluntary*.　But what could be more inevitable than
the loss here described ?　The special verdict says, "the captain,
finding no possible means of saving the vessel or cargo and
preserving the crew," &c.; if this be not the description of a
peril of inevitable loss, words cannot describe it.　It is sug-
gested in the plaintiff's argument, that she slipped her cables,
and therefore must have been still held by her anchors, and
might have survived the storm.　But the jury had found "that
there was no possible means of saving the vessel," &c.; they
therefore found that the anchors and cables were not such
means ; and by reference to the previous parts of the special
verdict, it appears that the anchors and cables, while all sound,
had not held the ship ; that she had ripped up the windlass, had
parted the chain cable, had struck on a shoal, and lay broadside
to the wind and heavy sea.　It cannot be contended that the
case of the brig Hope was not utterly hopeless.　The act of the
master was a voluntary stranding, only because he selected an
easier bed for the ship to die on.

These facts found in the special verdict amounted, in the
opinion of the court, to "a voluntary running on shore of the
brig Hope ; that there was no other possible means of preserv-
ing the crew, the ship, and the cargo ; that the running ashore
was for this express object."　Facts thus found, and a special
verdict thus expounded, admit of no explanation, for they are
already too plain.　They admit of no distinction from any case
of inevitable loss and voluntary stranding, where the ship must
go ashore, and the captain merely selects the spot and varies
the time.　Both by the facts as found by the jury, and the ex-
position of them by the court, the question now argued was
there presented.　Why is it not to be deemed decided?

It is said that the points principally argued were, whether the
doctrine *salva nave* applied to the mere saving of the ship, or to
the successful result of the stranding.　But that being decided
for the ship, the question of inevitable danger still lay between
the ship and her claim to contribution ; nay, it was preliminary
to it.　Unless a contribution might be due for a voluntary
stranding to avoid inevitable loss, the question of *salva nave* did

not arise.   There was, according to the present plaintiffs' argument, no ship to be saved; her ruin was inevitable, and so she was really lost before the stranding.

Will it be said that the court did not argue the point?

The counsel for the cargo there did, indeed, take the point, in opposition to the counsel for the cargo here, that there must be shown an inevitable necessity for the stranding.   The counsel for the ship there distinctly presented the fact, that the danger was inevitable.   " There was no hope if he remained at anchor; certainly none, if he attempted to breast the fury of the storm."   The judge who delivered the opinion quotes from Emerigon the passage above translated, as to running ashore in the less dangerous place; he examines the opinions in the cases, Caze *v.* Reilly, 3 Wash. C. C. R. 298; Sims *v.* Gurney, 4 Binney, 513; and Gray *v.* Waln, 2 Serg. & Rawle, 229, and says, " We have examined the reasoning in these opinions, and are bound to say, it has our unqualified assent."

It is to be observed, in addition, that Judge Story puts the very case which occurred in Maine (3 Fairfield, 190), and considers it a general average.   The case of Walker *v.* United States Ins. Co., 11 Serg. & Rawle, 69, was also cited by the counsel; the very case which Judge Kennedy, in 4 Wharton, deems to overrule Sims *v.* Gurney, in 4 Binney.   Judge Story also remarks upon the opinions of Stevens; and with all these cases before the court, they adjudged this a case of voluntary stranding to avoid inevitable loss, and one calling for general average contribution.   If this does not, as a decision, cover a case upon identically the same facts, certainly upon facts presenting the very same question, what decision can do it?

It adds to the weight of this decision, that in the case of Sims *v.* Gurney this very point was made, argued fully by counsel, and distinctly passed on by the court.   Tilghman, C. J. says (p. 256), " It is said that the ship must have gone ashore somewhere, and it made no difference where that shore was.   It is not necessary that the ship should be exposed to greater danger than she otherwise would have been, to make a case of general average."   With this before them, the point then so clearly raised, so fully argued, so expressly decided, and the reasoning of Sims *v.* Gurney so fully adopted, there was no call for discussing it again in the opinion pronounced in the case of the Hope (13 Peters).

The decision of this court in the case of the Hope has ever since been considered as settling the law on this point.   It was decided in 1839.   In the spring of the same year, the very same point of a voluntary stranding to avoid an inevitable loss arose in Massachusetts, in the case of the Gem, precisely like that

of the Hope, and this very point was made by Curtis, counsel; upon which Shaw, Ch. J. laid down, " that if the cable was voluntarily cut, and the vessel run on shore as the best expedient for saving life and property, although the vessel was in imminent peril, and although there was every probability that she would sink at her anchors, or part her cables and drive ashore if not cut, still the loss is to be considered as coming within the principle of general average," and cites the case in 13 Peters. (Reynolds *v.* Ocean Ins. Co., 22 Pick. 197.)

Again, in 1845, in the case of the ship George, the District Court of New York considered this point covered by the decision in 13 Peters (8 Law Reporter, 361), and in the case now under review, the judges of the Circuit Court for the Southern District of New York considered the decision in 13 Peters applicable and decisive. And although the decision appealed from is to be held open for consideration and suspended in effect, yet in a question of commercial law, to be carried out in the important, although rapid, operations of merchants, adjusters of losses, &c., the manner in which a decision is received by persons competent to understand it, and has been acted on for ten years, well deserves consideration as showing its plain meaning and extent. This decision has entered largely into the business of the country as thus understood, and should not, even if its original correctness had been dubious, be either disturbed or made useless by nice and refined distinctions. So far as the argument of the plaintiffs on authority is understood, it rests on the two cases 11 Serg. & Rawle, and 4 Wharton, cited on their points. The former was directly before this court, cited by Mr. Semmes *arguendo* in the case of the Hope, p. 337, and, if opposed to that decision, was silently rejected by this court. This court adopted the opposite conclusions given in the case of the Woodrop Sims, 4 Binney. The latter case, Meech *v.* Robinson, 4 Wharton, 360, decided in 1839, is remarkable for its disregard of the decision in 4 Binney, and its opposition to 13 Peters (the Hope), decided in the previous part of the same year, and not noticed by the judge. However the courts of Pennsylvania may make free with their own decisions, they cannot be permitted to unsettle the law decided in this court, and recognized and adopted in this extensively commercial country. The decision in 4 Binney was after arguments the most creditable to the abilities and research of the eminent counsel engaged, and upon a discussion of the whole subject by Ch. J. Tilghman of unsurpassed learning and ability. It was distinctly approved and adopted by this court, and, with the judgment of this court, has stood too long and is too firm to be now shaken.

The second point of the plaintiffs in error, being in opposition to the third point of the defendants, relates to the values of the parts of the cargo on which contribution is to be assessed; and this depends upon the place where the contribution is to be made. It is not necessary to examine or criticize the cases cited upon this point by the plaintiffs in error. It is supposed that the case rests on general principles, of a practical character, well settled. It will not and cannot be denied, that, by the reception of cargo on shipboard, the adventure was begun, nor that it was to terminate in New York. The shippers of the nutria skins at Buenos Ayres made no claims to them there after the disaster, but allowed their transshipment to New York, by the master of the stranded ship, without any new contract of affreightment. Now, where was the master, whose duty it was to collect the general contribution, entitled to demand the payment, and where the owner of the goods bound to pay it? The ship lost had been destined to New York with this cargo, there to be sold. Had the master a right to exact payment of the average in the place of shipment? Was the shipper, who had already advanced the price of purchasing the goods, bound to advance in addition the general average? He looks to the sales of the goods, or the consignee, in New York, to pay their freight and expenses. He is not even to be presumed the owner, but may as probably be a shipping agent merely, who has fully executed all his authority by making the shipment. He has no funds for the purpose of these charges. He does not demand back the goods, but lets them go forward to their original destination on the old freight contract; they arrive in safety at New York. There is the place of destination, reached by the cargo. There is the proper place, and only proper place, of valuing the vessel, an American registered ship. The freight being lost, is a freight to the home port of destination. Free, then, from all technical objections, the place of destination was the place proper for payment of the charge.

This becomes still more apparent if the rule of valuation for cargo lost be considered; and the rule of valuing cargo lost and cargo saved is always the same. By a general average sacrifice the owner is not merely indemnified in the cost of his goods. The freight on lost goods is paid in contribution, and is assessed in contribution. The goods are paid for at their value at the place of destination. The merchant recovers, not only first cost, but profits. The merchant and ship-owner, therefore, are both entitled to compensation as of the place of destination. It follows, that they must be assessed on the values at that place. (See Abbott on Shipping, 1 Perkins's ed.,

25*

607, [504,] ch. x. pl. 4, s. 13, 14.) The lading port spoken of in Abbott is to be understood as the home lading port, and not the lading port abroad.

The adjustment in the case of the George (8 Law Rep., 361) will be found to be a case where the value of the cargo was agreed; it was not a valuation at the home or foreign ports of the voyage, but at the port of distress; and as a large part of the cargo was sold there, and the proceeds of the wreck sold were received there, that rule was, by a sort of forced concession, adopted.

As to the jerked beef, although not injured in the stranding itself, yet it was in the transportation for reshipment. This was a direct consequence of the stranding, resulting from the necessity, thereby occasioned, of transshipment by boats. The beef was bound for New York, and liable to pay on its increased value there, if it arrived safely. Consequently, if the value was diminished on arrival at New York, the same rule operated to diminish the value for assessment to the contribution.

The whole argument on this point, by the plaintiffs in error, proceeds on the supposition of the voyage being wholly broken up at Buenos Ayres. But in fact this was not so. None of the shippers claimed, or appeared willing to claim, or receive back their goods. They were immediately and continuously forwarded in another vessel, then at Buenos Ayres, with the master of the Brutus as master. There was, therefore, an agreed continuance of the adventure until all the property reached the place of its destination. The ship could not have been properly valued at Buenos Ayres, being an American ship, not sent there for sale, but to be employed and returned to New York, her home port. There her only correct value, for assessment, could be ascertained. The place where the average shall be stated is always dependent, more or less, on accidental circumstances, affecting, not the technical termination of the voyage, but the actual and practicable closing up of the adventure. It admits of no very certain rule of law. And it is humbly submitted, that in this point there was no error in the court below.

The third point of the plaintiffs respects the precise time at which the wages and provisions of the ship's company cease to be a general charge. It does not raise any question that the wages and provisions are not a general charge for some time after the stranding. They are in the nature of salvage charges, and therefore general. The point of time at which the plaintiffs in error insist they shall cease, is that of its being certain that the ship could not be got off, and of her sale being

determined. It is obvious that this may have been done long before the cargo was discharged, long before it was transshipped by the boats and crew of the ship. But these wages and provisions ought to be paid by the adventure, as long as the services of the crew, as mariners, laborers, or quasi-salvors, were bestowed upon the adventure. Immediately on the stranding, it could be determined that she could not be again floated; and the determination, of course, would be to sell the wreck. But until the entire saving of the cargo and of what could be saved from the ship, the services of the crew were essential to both.

There is no ground in law to say that the duties of the mariners ceased when the stranding became fatal. They still owed duties as mariners both to ship and cargo, and had a lien on the ship for wages, or salvage as a substitute for wages, until the cargo was fully and properly disposed of from the wreck. Being properly employed upon the ship and cargo, even if it were true, as it is not, that their obligation to the ship had ceased, still their services to vessel and cargo entitled them to wages and to their support as a general charge.

The fourth point respects the commissions for collecting the average.

The plaintiffs' argument rests on this not being a service ever allowed to a claimant or creditor, and on the allegation that it is not a service to the common adventure. The argument is the more plausible, because, in this instance, the ship-owners who collect the contribution are the parties to whom it is all payable. But this is not generally so, there being usually contributions to be paid out as well as received; and if among recipients the ship-owners were only one among a number, there would be no discrimination or deduction on that amount; and the rule must be a general one, applicable generally to the office of being the accounting party in the general average.

Taking this to be the true relation of the ship-owner, he is evidently an official agent and trustee, involved by the disaster causing the average in new and responsible duties, often very difficult and embarrassing.

They are duties not embraced in his obligation as a mere carrier. They are duties arising out of unforeseen disaster. They are duties which directly result from the disaster, as much so as the damage to cargo by water getting in when a jettison is made. On the general principles of law, therefore, the trouble of this compulsory agency and the compensation for it arise from the disaster, form part of it, and ought to accompany it in the contribution. In the present case, the ser-

vices were those of commission merchants, transacting the business for the owners. This, while it may not vary the principle, relieves its present application from the ostensible objection that the owners are themselves receiving a commission on collecting their own claim.

*Mr. Webster,* in conclusion, for the plaintiffs in error.

In considering the nature of "a general average peril in the conceded instances of it," the counsel for the defendants in error, for the purpose of identifying this case with those conceded cases, maintains the proposition that a master is never justified in making a jettison or other sacrifice, "unless the loss, at the time he resolves on the measure, is inevitable unless he resorts to it."

This proposition cannot be maintained either by reasoning or on authority. When the community of interest of which the master has charge is placed in circumstances of peril, it is not necessary that loss should be inevitable, in order to justify his deliberately sacrificing one interest to insure the safety of the rest; or putting one interest to greater risk in order that the risk of the remaining interests may be diminished. It is enough that the risk be real, but it may be more or less imminent. A slight risk would justify a trifling sacrifice. A more imminent risk a greater sacrifice. The terms risk, hazard, peril, and, indeed, the whole class of words used in describing general average cases, always include both the idea of danger and the possibility of escape. The only questions in judging of the propriety of the course of a master, in any given case of voluntary sacrifice, are, Was the peril real? and was his act the result of deliberate judgment, and not the consequence of mere panic? This answers the assertion of the defendants' counsel, that our principle "tears out the whole law of general average." So far is it from this, that it accompanies every voluntary sacrifice made in time of peril for the common benefit, and awards contribution.

The counsel for the defendants in error, throughout his points, brief, and argument, seeks to confound and confuse words and phrases which have distinct and well understood differences of meaning. Thus, on one page only of his printed argument, he uses the phrases "certain peril," "inevitable danger," "peril inevitable," and "loss inevitable," as though these were equivalent and convertible terms. A peril may be inevitable, and yet no loss accrue; but to say that loss is inevitable, and yet may not happen, is to do violence to language. We should not notice this, if it were an inadvertent misapplication of a term; but there is an evident design to

dwarf the meaning of the term *inevitable*. Thus, on the same page, it is said, " The greater the danger and the more inevitable," as though inevitability admitted of degrees, and as if the word *inevitable* were a merely equivalent term to the word *peril*. Indeed, in the points, it is insisted that the term " inevitable loss " ought to be construed to mean merely " the highest degree of conjecture of loss " ; in short, that the term " inevitable loss " is to be tortured from its meaning, and pronounced by this court to mean merely imminent risk ; and it is only by thus conjuring with words that the judgment in this case can be sustained.

To constitute a case for general average contribution, two things must concur : —

1st. The existence of danger not inevitable, but capable of being avoided by the means resorted to.

2d. The evidence of a " deliberate purpose to sacrifice the thing claiming contribution at all events ; or, at the very least, to put it into a situation in which the danger of eventual destruction would be increased." Gibson, J., in Walker *v.* United States Ins. Co., 11 Serg. & Rawle, 61.

In this case both these elements were wanting.

This is substantially conceded by the defendants. They say, — " The voluntary act, then, is not to determine whether any thing shall be destroyed. Destruction is upon them already ; all will be destroyed (by stranding) as the circumstances stand." " Refining criticism may waste itself in calling this a compulsory choice, a compulsory voyage to the shore, a selecting a safer exposure, — in denying it to be a sacrifice. It is nevertheless all the voluntary act which remains to the master to perform." So much for the certainty of loss, according to the defendants' own showing. As to the fact that no sacrifice was made, no increased risk of loss to the ship run, they are equally explicit. The result of the mate's act was, it is conceded, the " greatly lessening the injury to the ship."

The defendants' counsel dwells on the seeming equity of the cargo saved by the act of the mate contributing to the loss of the ship. The answer to that is twofold.

1st. The ship was not lost, sacrificed, or injured by the act of the mate, but saved by that act, so far as it was saved at all. That this act was less beneficial to the owners of the ship than to the owners of the cargo, was a mere accident. Just such a case might happen near New York, and the ship be got off the beach with little injury ; while a valuable cargo, consisting of teas or other articles readily destructible by sea-water, might have been destroyed. The act of the mate was one done in the exercise of ordinary care and diligence, for the benefit of

each and every thing and being under his care. Each and every thing and being under his charge was benefited, more or less. The degree of benefit varied, but not as the result of any design or attempt to sacrifice one thing to save another, but as a mere fortuitous, unintentional result.

2d. The several persons engaged in a sea risk are not mutual insurers; each runs the risk of his own adventure. A ship is struck by a squall, and the masts carried away; a wave carries the boats overboard, or breaks in the bulwarks; the loss must be borne by the ship-owner. So in repulsing an assault by an enemy, "neither the damage to the ship, nor the ammunition expended, nor the expense of healing the mariners wounded in an action against an assailing enemy, is a subject of average contribution." (Perkins's Abbott on Shipping, 501.) A heavy sea sweeps away deck freight, or finds its way into the hold and injures the cargo. Then the owner bears the loss. A wreck occurs, one man's property is saved slightly damaged, another's greatly damaged, the value of another's is entirely destroyed. Each man must bear his own loss. Out of this very equality and independence of the several owners arises the doctrine of general average. No man has the right to ask, in a case of common danger, that another's property shall be singled out and sacrificed, or put in greater jeopardy, for his benefit; and so the law gives to the owner of property thus selected for sacrifice a right of contribution against those whose property, with no greater right to protection than his, has been saved or less imperilled at his expense or risk; but it is this selection, this dedication of the thing to sacrifice or special hazard, which is the very foundation of the right to general average.

The cases cited by the counsel for the defendants are, when carefully examined, confirmations of this view.

The reasoning of Ch. J. Tilghman, quoted in the defendants' argument, is in exact accordance with our views of the law. The equity on which the right to contribution in general average is founded is the reasonableness "that the property saved should contribute to make good the loss which was the cause of safety." So the language of Judge Sewall: — "General average is a contract by which distinct properties of several persons become exposed to a common peril, and a relief from that peril at the expense of one or more of the concerned, who are therefore entitled to contribution from the rest: provided, the benefit was intended, as well as obtained, by the destruction or at the peculiar hazard of the property lost."

The judgment of the court below being unsupported by principle, the case of the Hope, in 13 Peters, is urged upon the

court, with desperate pertinacity, as decisive of this case; but we have shown, in our opening argument, that that was a case in which the vessel was still held by her anchors, and in which, by the deliberate act of the master, the vessel was deprived of all the means that then held her; a case in which the court treats the voluntary stranding as expressly found by the special verdict, as indeed it was. The language of Mr. Justice Story is, " The special verdict finds that there was a voluntary running on shore of the brig Hope."

He at once proceeds to discuss the question which he deemed open for discussion, and decides that, in case of voluntary stranding, the *salva nave* is not necessary to constitute a claim for contribution. He neither discusses nor decides what facts constitute a case of voluntary stranding; and it cannot be supposed that that learned and most painstaking jurist, and this learned court, would decide so important and delicate a question by mere silence, and that against such a weight of reasoning and against the whole current of authority. We say by mere silence, for, notwithstanding what is said, an inspection of the case will show that the cases cited by the court are cited in relation to the necessity of the *salva nave* to entitle the party to contribution, and not in relation to the question of what constitutes voluntary stranding. It is clear that the case is still an open question in this court, and we emphatically dissent from, and deny the assertion of, the counsel for the defendant, that "the decision of this court in the case of the Hope has ever since been considered as settling the law on this point." On the contrary, it is, doubtless, well known to the learned judge who tried this cause, that the bar of New York do not consider the main point in this case as settled by the case of the Hope, and that they do consider this as the very case in which that question is to be settled, and that for the first time.

Driven by the difficulties of the case to avail themselves of every aspect of the case which even has a remote plausibility, the defendants urge that an anticipation of the time of destruction is a ground for considering the stranding voluntary; but there is no evidence that the time of stranding was hastened by the mate; but if it were, that surely cannot alter the character of the act done. Surely a moment sooner or later cannot determine such important interests. *De minimis non curat lex.*

We rest the other points in this case on the arguments already presented.

Mr. Justice GRIER delivered the opinion of the court.

The plaintiffs below, Joseph Adams and others, brought this

action against Charles Barnard and others, in the Circuit Court of New York, to recover contribution in general average for the loss of their vessel called the Brutus, on board of which certain goods were shipped, and consigned to the plaintiffs in error, and delivered to them on their promise to pay, provided contribution were justly due.

On the trial, the Circuit Court gave certain instructions to the jury, which were tne subjects of, exceptions, on the correctness of which this court is-now called upon to decide.

As the facts of the case were not disputed, it will be proper to state them, in connection with the instructions given by the court, in order to avoid any mistake or misconception which might arise in construing the terms of mere abstract propositions without relation to the facts on which they were based.

On the 8th of October, 1843, the ship Brutus was lying at anchor, at the usual place of mooring vessels in the outer roads at Buenos Ayres, about seven miles from the shore. The width of the river at that place, between Buenos Ayres and Colonia on the opposite shore, is about fifteen miles. The Brutus had taken her cargo on board for New York, consisting of nutria skins, dry hides, horns, and jerked beef. The master was on shore, and she was in charge of the first mate, with a crew consisting of twelve persons in all. On the 7th, a gale had commenced, which on the 8th had become dangerous. About four o'clock next morning the ship began to drag her anchors, and the small bower anchor was let go. About nine o'clock in the evening, the gale increasing, the best bower anchor parted with a loud report. About ten o'clock, the small bower parted, and the ship commenced drifting broadside with the wind and waves. Endeavors were then made to get the ship before the wind, which failed, on account of the chains keeping her broadside to the sea, which was making a breach over her fore and aft. The chains were then slipped, and the vessel got before the wind, two men were put to the wheel, and one to the lead, and it was determined "to run the ship ashore for the preservation of the cargo and the lives of the crew." It was now about eleven o'clock at night when the ship was got before the wind and under command of the helm. The shore next to Buenos Ayes, towards which the ship had been drifting, had banks and shallows extending out some three or four miles. If the vessel had been driven on these by the tempest, she would have been wrecked and lost, together with the cargo and crew. On the Colonia side of the river were sunken rocks several miles from the shore. "For the purpose of saving the cargo and crew any how, and possibly the ship," she was steered up the river, inclining a little towards

the Buenos Ayres side, with the intention of running her on shore at a convenient place. After they had proceeded up the river about ten miles, the mate discovered from the flashes of lightning that the vessel was approaching a point called St. Isidro, off which he perceived something black which he supposed to be rocks, and "being afraid," or "thinking it impossible to get by" this point without being wrecked and lost, he directed the course of the vessel to be changed towards the shore, where he had seen what he supposed to be a house, but which turned out to be a large tree. About midnight the vessel struck the beach and the rudder was knocked away. The foresail was then hauled up, but the staysail was let remain to keep her head straight, and she continued to work herself up until daylight. The place where she was stranded was a level beach about two hundred yards above ordinary low-water-mark. The ship was not wrecked, or broken up, though somewhat damaged, and the cargo was not injured. The master chartered the bark Serene, and transferred the cargo to her. But it was found that, with the means to be obtained in that vicinity, it would have cost more than the ship was worth to get her off the beach. She was therefore sold. The Serene afterwards arrived safely at New York, under command of Captain Adams, former master of the Brutus. In transshipping the jerked beef from the Brutus to the Serene, a portion of it got wet, and when it arrived at the port of New York it was all found to be worthless.

On these facts, the court instructed the jury as follows : —

1. " The evidence on the subject of the stranding consists in the uncontradicted and unimpeached testimony of a single witness. He was the acting master of the vessel at the time of the loss in question. He states that when the vessel was without any means of resisting the storm, and her going ashore upon a rocky and more dangerous part of the shore was, in his opinion, inevitable, he did intentionally and for the better security of the property and persons engaged in the adventure, give her a direction to what he supposed to be, and what proved to be, a part of the shore where she could lie more safely. These facts, if credited by you, constitute in judgment of law a voluntary sacrifice of the vessel, and for such sacrifice the plaintiffs are entitled to recover in general average."

This instruction forms the subject of the first exception, and raises the most important question in the case.

The apparent contradiction in the terms of this instruction has evidently arisen from a desire of the court to give the plaintiffs in error, on the argument here, the benefit of the negation of their own proposition, viz. that if the loss of the vessel

by the storm was inevitable, the stranding could not be a voluntary ".sacrifice entitling the plaintiffs to contribution." It is because the form in which this proposition is stated is equivocal and vague, when applied to the case before us, that the negation of it appears to be contradictory in its terms. The court should, therefore, not be understood as saying, that, if the jury believed the peril which was avoided was "inevitable," or that if the jury believed that the imminent peril was *not* avoided, they should find for the plaintiffs. But rather, that if they believed there was an imminent peril of being driven "on a rocky and dangerous part of the coast," when the vessel would have been inevitably wrecked, with loss of ship, cargo, and crew, and that this immediate peril was avoided by voluntarily stranding the vessel on a less rocky and dangerous part of the coast, whereby the cargo and crew were saved uninjured, then they should find for the plaintiffs. Looking at the admitted facts of this case in connection with the instruction given, it is plain that the jury could not have understood the court to mean any thing else. And we may add, moreover, that, in the argument here, the learned counsel have not relied upon any verbal criticism of the instruction, but have encountered fairly the proposition which we now consider as maintained by the court below.

It cannot be denied by any one who will carefully compare this case with that of The Hope, 13 Peters, 331, unanimously decided by this court, and the cases of Caze *v.* Reilly, 3 Wash. C. C. 298, Sims *v.* Gurney, 4 Binney, 513, and Gray *v.* Waln, 2 Serg. & Rawle, 229, which have received the "unqualified assent" of this court, that, whatever distinctions may be taken as to the accidents and circumstances of these cases, they do not materially or substantially differ from the present, so far as the point now under consideration is concerned; and that we are now called upon to reconsider and overrule the doctrine established by those cases. But however they may appear to be contrary to certain abstract propositions stated by some text-writers on this subject in England, and a case or two in this country, the policy and propriety of overruling our own and the three other decisions which have received our "unanimous approval," even if we were not now satisfied with their correctness, may well be doubted. There are few cases to be found in the books which have been more thoroughly, laboriously, and ably investigated by the most learned counsel and eminent judges. In questions involving so much doubt and difficulty, it is of more importance to the mercantile community that the law be settled, and litigation ended, than how it is settled. No decision of a question depending on such nice and subtile

reasoning will meet the approbation of every mind; and if the cases we have mentioned have failed of this effect, it may well be doubted if any reasons which could be given for overruling them would prove more successful.

It is not necessary, in the examination of this case, again to repeat the history of this doctrine of general average, from the early date of the " *Lex Rhodia de jactu,*" through the civil or Roman law, and the various ordinances and maritime codes of European states and cities, down to the present day. The learned opinions delivered in the cases to which we have alluded leave nothing further to be said on that portion of the subject. We shall therefore content ourselves with stating the leading and established principles of law bearing on the point in question, in order that we may have some precise data with which to compare the facts of the present case, and test the value of the arguments with which the instructions of the Circuit Court have been assailed.

The law of general average has its foundation in equity. The principle, that " what is given for the general benefit of all shall be made good by the contribution of all," is recommended, not only by its equity, but also by its policy, because it encourages the owner to throw away his property without hesitation, in time of need.

In order to constitute a case for general average, three things must concur : —

1st. A common danger; a danger in which ship, cargo, and crew all participate; a danger imminent and apparently " inevitable," except by voluntarily incurring the loss of a portion of the whole to save the remainder.

2d. There must be a voluntary jettison, *jactus,* or casting away, of some portion of the joint concern for the purpose of avoiding this imminent peril, *periculi imminentis evitandi causa,* or, in other words, a transfer of the peril from the whole to a particular portion of the whole.

3d. This attempt to avoid the imminent common peril must be successful.

It is evident from these propositions, that the assertion so much relied on in the argument, namely, " that if the peril be inevitable there can be no contribution," is a mere truism, as the hypothesis of the case requires that the common peril, though imminent, shall be successfully avoided. Those who urge it must therefore mean something else. And it seems, when more carefully stated, to be this, " that if the common peril was of such a nature, that the ' *jactus,*' or thing cast away to save the rest, would have perished anyhow, or perished 'inevitably,' even if it had not been selected to suffer

in place of the whole, there can be no contribution." If this be the meaning of this proposition, and we can discover no other, it is a denial of the whole doctrine upon which the claim for general average has its foundation. For the master of the ship would not be justified in casting a part of the cargo into the sea, or slipping his anchor, or cutting away his masts, or stranding his vessel, unless compelled to it by the necessity of the case, in order to save both ship and cargo or one of them, from an imminent peril which threatened their common destruction. The necessity of the case must compel him to choose between the loss of the whole and part; but, however metaphysicians may stumble at the assertion, it is this forced choice which is necessary to justify the master in making a sacrifice (as it is called) of any part for the whole. Hence the answer of every master of a vessel, when examined, will be, " I considered the destruction of both ship and cargo ' inevitable,' unless I had thrown away what I did." " The goods thrown away would have gone to the bottom anyhow." If the case does not show that the jettison was "indispensable," in order to escape the common peril, the master would himself be liable for the loss consequent therefrom. It is for this reason, that the ordinances of Marseilles require that the master should have a consultation with the supercargo and crew as to the absolute necessity of the measure, and as evidence that it was not done through the vain fears, cowardice, or imprudence of the master. But the right to contribution is not made to depend on any real or presumed intention to destroy the thing cast away, but on the fact that it has been selected to suffer the peril in place of the whole, that the remainder may be saved. The anchor lost by voluntarily slipping the cable may be recovered, the goods jettisoned may float to the shore and be saved, and yet, if the anchor or goods had not been cast away, they would have been "inevitably" lost, and there would have been a total loss of both ship and cargo. Take the case of Caze *v.* Reilly. A vessel is completely surrounded by the enemy's cruisers. It is impossible to save both ship and cargo from capture and a total loss. A part or the whole of the cargo is thrown overboard, and thus the vessel escapes. This is an admitted case for contribution. And it is no answer to the claim of the owners to say, " Your cargo was ' inevitably ' lost; as it was situated it was worthless, and consequently you sacrificed nothing for the common benefit. Besides, a portion of it floated on shore and was saved from capture, or was fished from the bottom without sustaining much injury; the throwing it overboard was the best thing that could be done for it under the circumstances, as without that it would have been

'inevitably' lost." But suppose, as in the case referred to, the ship cannot be saved by casting the cargo into the sea, but the cargo, which is of far greater value, can be saved by casting the vessel on the land, or stranding her. Is it any answer to her claim for contribution to say, that "her loss was ' inevitable,' she was in a better situation on the beach than in the hands of the enemy, or at the bottom of the sea, or wrecked upon rocks, and therefore there was no such sacrifice as would entitle her to contribution"? We cannot comprehend why this argument should have no weight in the first case (which is an admitted case of contribution in all the books), and yet that it should be held as a conclusive obstacle to the recovery in the latter. The replication to this objection in the first instance, and the conclusive one, is, " the vessel and cargo were in a common peril, where both or all could not be saved; the vessel alone, or the vessel and part of the cargo, have been saved, by casting the loss upon the cargo, and this constitutes the very hypothesis on which the doctrine of general average rests." Why, then, should there be a difference in principle, where the cargo is damaged or lost by being cast into the sea, and the ship saved, and the case where the ship is damaged or lost by a voluntary stranding, or by being cast on the land, and the cargo saved, is a question which has never yet been satisfactorily answered. In fact, we do not understand the counsel to contend for the doctrine of *salva navi*, or that the Brutus was not entitled to contribution because she could not be got afloat at a less cost than her value. The principle on which the counsel relied is that enunciated in the opinion of the court in Walker *v.* United States Ins. Co., 11 Serg. & Rawle, 61. " It is not enough," says the learned judge, " that there be a deliberate intent to do an act which may or may not lead to a loss; there must be a deliberate purpose to sacrifice the thing at all events, or at the very least to put it in a situation in which the danger of eventual destruction would be increased."

But, as we have already seen, the intention to destroy the *jactus*, or thing exposed to loss or damage for the benefit of the whole, makes no part of the hypothesis upon which the right of contribution is founded. Indeed, the speciousness of this assertion seems to have its force from the use of the word " sacrifice" in its popular and tropical, instead of its strict or technical meaning. The offering of sacrifices was founded on the idea of vicarious suffering. And when it is said of the *jactus*, that it is sacrificed for the benefit of the whole, it means no more than that it is selected to undergo the peril, in place of the whole, and for the benefit of the whole. It is made (if we may use another theological phrase) the " scape-goat" for

26 *

---

.Barnard et al. *v.* Adams et al.

---

the remainder of the joint property exposed to common destruction. The "*jactus*" is said to be sacrificed, not because its chance of escape was separate, but because of its selection to suffer, be it more or less, instead of the .whole, whose chances of safety, as a whole, had become desperate. The imminent destruction of the whole has been evaded as a whole, and part saved, by transferring the whole peril to another part.

If a cargo of cotton, about to be captured or sunk, be thrown overboard in part or in whole, and the ship thus saved, the fact that the cotton floated to the shore and. was saved, and therefore was in a better condition by being cast away than if it had remained to be captured or sunk, cannot affect its right to contribution, though it may diminish its amount. The loss or damage arising from its assuming the peril, that the ship may escape, may be truly said to be the real " sacrifice,". in the popular use of the phrase. Its value is not measured by its hopes of safety, for by the hypothesis it had none; but its right to contribution is founded on its voluntary assumption to run all the risk, or bear the brunt, that the remainder may be saved from the common peril. The fact that goods thrown overboard are in no worse, or even in a better, condition as to chances of safety, than if they had remained on board, or that the stranded vessel is in a better condition than if. she had been wrecked or sunk, cannot affect the right to contribution of that part which was selected to suffer in place of the whole.

Having made these remarks, by way of vindicating the cases referred to, and noticing the arguments by which they have been assailed, let us briefly compare the. facts of this case with the principles we have stated, and inquire, first, What was the common peril ? and second, Was any portion of the joint adventure saved from it by the transfer of the risk or loss to another ?

The common peril, which in this case was sought to be avoided, was shipwreck, or the destruction of vessel, cargo, and crew. The ship lay at anchor ; she was assailed by a violent tempest, her cables broken, her anchors gone, and she was being driven by the force of the gale broadside upon the shallows extending three miles out from the shore at Buenos Ayres. In order to save the cargo and crew, it is determined to put on sail, and run up the river to find a safe place to strand the vessel. They proceed ten miles up the river, when they encounter another peril at Point St. Isidro. To avoid being wrecked on the rocks, the course of the vessel is immediately changed, and she is steered directly for the shore, and run upon a sandy beach, where she is left high and dry by the tide. The cargo is saved without injury, but the ship is on the land, where she

is comparatively valueless, on account of the expense which must be incurred to replace her in her element. By the will and directions of the master, she has become the victim, and borne the loss, that the cargo might escape from the common peril. It is true she has not been wrecked or lost, as she inevitably would, had she been driven on the flats at Buenos Ayres by the tempest, or been foundered on the rocks off Point St. Isidro, but she has voluntarily gone on shore, which was death to her, while it brought safety to the cargo. And we are of opinion she has the same right to demand contribution that the owners of the cargo would have had against her, had it been cast into the sea to insure her safety.

There is therefore no error in the instruction given by the court below on this point.

2. The second and third instructions excepted to have reference to the place at which the goods are to be valued for the purpose of adjusting the general average.

The reasons given by the learned judge in these instructions are amply sufficient to show their propriety. The adventure was continued, notwithstanding the disaster, and terminated at New York. The goods were not returned to the shippers, and consequently no contribution could be collected at Buenos Ayres. The fact that the Brutus was left on the strand, and the adventure continued till the cargo reached its destination in another vessel, cannot affect the case. The place where average shall be stated is always dependent, more or less, on accidental circumstance. affecting not the technical termination of the voyage, but the actual and practical closing of the adventure. We see nothing in the circumstances to take this case out of the general rule, that contribution should be assessed on the value at the home port.

3. The third exception relates to the allowance of the wages of the crew after the ship was stranded.

But as they were employed as mariners and quasi-salvors of the cargo, laboring for the joint benefit of the adventure, we think the exception is not supported. Their services were essential to the entire saving of the cargo. Their duties did not cease with the stranding, and they were entitled to wages while their services were required for that purpose. If the same services had been rendered by strangers, the expense would have been properly charged as a result of the disaster, in stating the average. That the same services were rendered by the crew after the Brutus was stranded, and the voyage as to them technically broken up, cannot affect the case. Even if their obligation to the ship had ceased, still their services to vessel and cargo entitled them to their wages and support as a general charge.

4. The two and a half per cent. allowed for collecting the general average rests upon the usage and custom of merchants and average brokers. It is a duty arising out of the unforeseen disaster, and resulting directly from it. Usually there are contributions to be paid out, as well as received, by the ship-owner. It is a troublesome duty, not embraced in their obligation as mere carriers. The usage is therefore not unreasonable. The objection, that it is paying the owners for merely collecting their own debt, is founded on the accidents or peculiar circumstances of this case, and does not affect the general principle on which this usage is based.

The judgment of the Circuit Court is therefore affirmed.

Mr. Justice DANIEL dissented.

The decision just pronounced, so far as it goes, must of course be regarded as settling the law of this court upon the subject of general average, that decision being in complete accordance with the decision of The Columbian Assurance Co. *v.* Ashby and Stribling, 4 Peters, 139; the single case from this court previously maintaining the doctrine announced by the court in the case before us. But, however the decision now made may control the question of general average in the courts of the United States, as it must do, being the revised and reaffirmed doctrine of this tribunal, still, with the sincerest respect entertained for the opinions of my brethren, and with unaffected diffidence as to the conclusions of my own mind, I have been unable to yield to this doctrine my assent. I cannot but regard the doctrine here affirmed as opposed to the course of opinion (the settled and undisputed opinion) in the greatest maritime and commercial nation in the world, and as subversive of the fundamental principle in which the law of average has its origin. That principle, which is traced by all writers and courts to the Rhodian law, is thus propounded by Lord Tenterden, in his work on Shipping (p. 342): "Namely, the general contribution that is to be made by all parties towards a loss sustained by some for the benefit of all." The same writer (p. 344) says that goods must be thrown overboard; the mind and agency of man must be employed. If the goods are forced out of the ship by the violence of the waves, or are destroyed in the ship by lightning or tempest, the merchant alone must bear the loss. The goods must be thrown overboard for the sake of all. The same writer remarks (p. 348), that, though the rule mentions goods only, its principle extends also to the ship and its furniture.

Mr. Benecke, in his Treatise on Average (p. 96), tells us that general average has been described in the English courts to

comprise " all loss which arises in consequence of extraordinary sacrifices or expenses incurred for the preservation of the ship and cargo." After speaking of the enumeration of instances of general average in some of the Continental nations of Europe, he continues : " Although these laws and the corresponding ones of other states do not make use of the term *sacrifice*, yet their definitions imply that nothing short of a sacrifice shall be deemed a general average. All these laws may therefore be said to establish the same general principle; namely, that a sacrifice made for the preservation of the ship and cargo is general average." Again he says (p. 97) : " As to the term *sacrifice*, it is clear and generally admitted, that a damage, to deserve the appellation of a sacrifice, must have been purposely undergone, and by the agency of man, for the benefit of the whole, and that every damage not purposely undergone, although the ship and cargo may be benefited by it, gives no claim to restitution." Again, it is said with great force and propriety, that the special sacrifice must be something done and not suffered; there must be the will and agency of the party making it. That it should be for the purpose, and with the intent, *causa et mente*, of the preservation of the common concern. Although the examples of this sacrifice put are usually instances of *jactus*, the principle embraced applies equally to the ship as to the cargo ; thus Benecke (p. 144) says : " The case of voluntary stranding being implied in the general rules, most of the foreign ordinances omit to mention it expressly. The Prussian law is in this respect more explicit than the others. If the captain, say sections 1820 and 1821, in order to preserve the cargo, run the vessel intentionally ashore, the damage thereby occasioned to the ship and cargo, as well as all incidental charges, belong to the general average. But if it appear clearly from the circumstances, that the stranding was resorted to merely for the purpose of saving the lives or liberty of the crew, the damage, even if the whole cargo be saved, is held to be particular average. The ancient laws, says Benecke, as well as the opinions of the English and foreign lawyers, are also in favor of this distinction. And it is, as far as I have been able to learn, the practice of all countries." The same will, the same positive action, the same purpose, and, it may be added, the same predicament or position of the actors, must exist in each class of cases. There must be intent and act, prompted by, and tending to, a practicable, or at least a probable result, and not mere endurance or submission to uncontrollable necessity in either case.

Thus, says Benecke, " when a vessel is purposely run ashore (p. 143), and afterwards got off with damage ; the question

whether repairs of such damage belong to general or particular average depends entirely upon the circumstances of the case. If the situation of the vessel were such as to admit of no alternative; so that, without running her ashore she would have been unavoidably lost, and that measure were resorted to for the purpose of saving the lives or liberty of the crew, no contribution can take place, because nothing, in fact, was sacrificed. But if the vessel and cargo were in a perilous, but not a desperate situation, and the measure of running her ashore deliberately adopted, as best calculated to save the ship and cargo ; in that case the damage sustained, according to the fundamental rules, constitutes a claim for restitution." And Mr. Phillips, in his work on Insurance (Vol. I. p. 338), and in a note to Stevens on Average (p. 81), lays down the law, both in England and in the United States, to be this ; that " the voluntary stranding of the ship is general average ; but not the mere steering her to a less dangerous place for stranding, when she is inevitably drifting to the shore." I am wholly unable to perceive how, in conformity with the rules and principles above cited as constituting the foundation of general average, contribution could justly be claimed in this instance for the loss of the ship. For there is not a scintilla of proof in this cause tending to show a design to sacrifice the ship, or any thing else, nor tending to prove that the course pursued was one which, under any circumstances, could possibly have been avoided. On the contrary, the testimony establishes, as far as it is possible to establish any facts, that the stranding was the effect of the *vis major*, of an inevitable necessity, — that every effort was made to avoid this necessity, and that the only act of the mind apparent in the case was the determination, to repeat the language of Mr. Phillips, already quoted, " merely to steer her to a less dangerous place for stranding, when she was inevitably drifting to the shore " ; — a determination not less for the benefit of the ship than for that of the cargo, and one falling within the general scope of the duty and discretion of every master or seaman.

There is no contrariety in the testimony in this case. The single witness, the mate, who was examined, states most explicitly the hopeless and desperate condition of the vessel; — she had lost all her anchors, was in the midst of a hurricane, and drifting to the shore under a force which the witness explicitly says nothing could resist. He therefore did not elect to run her ashore, or to make her a sacrifice for the general good ; he only sought to save her as far as possible from danger or injury. It appears to me to be no slight paradox to assert, that a man is the positive and controlling agent in the

accomplishment of an effect which he merely suffers, and which is forced upon him by a power that he is wholly unable to resist or influence, and that it is equally paradoxical to declare, that we elect and seek a sacrifice or a peril from which we are most anxiously fleeing. The cases at *nisi prius* in the federal courts, and in the courts of the States referred to, leave this matter pretty much in equipoise, if indeed they do not incline to the side of the question here maintained. We have Story and Washington and Tilghman opposed to Kent and Gibson and Kennedy; with this consideration attending the decisions of the Supreme Court of Pennsylvania, that they are the most recent, and have been made upon an examination and review of the cases which they have overruled. Repeating the assurance of entire deference entertained for the opinions of my brethren, and of the sincerest diffidence of the conclusions of my own mind, yet being unable to concur in those opinions, I have no claim to share in their merits if they are right, and if they are incorrect, my position with respect to them should be equally understood.

## *Order.*

This cause came on to be heard on the transcript of the record from the Circuit Court of the United States for the Southern District of New York, and was argued by counsel. On consideration whereof, it is now here ordered and adjudged by this court, that the judgment of the said Circuit Court in this cause be, and the same is hereby, affirmed, with costs and damages at the rate of six per centum per annum.