## Case No. 13,572.

STURGESS et al. v. CARY et al.

[2 Curt. 59.] 1

Circuit Court, D. Massachusetts. Oct. Term, 1854.

AVERAGE—VOLUNTARY BEACHING — SELECTION OF PLACE.

1. A court of equity has jurisdiction to take an account of a general average loss, and decree contribution among those entitled to receive and bound to pay.

2. If a vessel, at anchor, is dragging towards the shore in a gale, but is in imminent danger of beating to pieces on rocks before reaching

1 [Reported by Hon. B. R. Curtis, Circuit Justice.].

the shore, and to avoid this danger the master voluntarily slips the cables and allows the vessel to be thrown on the beach, whereby the cargo is saved, this is a general average loss, though no selection was made of a place of stranding.

[Cited in Shoe v. Low Moor Iron Co. of Virginia, 46 Fed. 128.]

[Cited in Emery v. Huntington, 109 Mass. 436.]

This bill in equity was filed by [Lathrop L. Sturgess and others] citizens of the states of New York and Connecticut, owners of the bark Vernon, and certain insurance companies incorporated by laws of New York, and doing business in that state, against [Thomas G. Cary and others] the owners of the cargo of the bark, citizens of the state of Massachusetts, to obtain an adjustment of a general average loss and payment, by the defendants, of their contributory shares.

The case made in the bill was, in substance, as follows:—"Your orators allege that on the tenth day of February, A. D. eighteen hundred and fifty-three, the said Sturgess, Clearman, George Bulkley, and Walter Bulkley, were owners of a certain vessel—a bark called the Vernon—and that the said several corporations were insurers thereon, to the full amount of her value, against the perils of the seas, and other perils in the policies of insurance mentioned; that on the tenth day of February, said vessel was laden with a cargo of cotton and merchandise, owned by, and consigned to, the said several defendants, as appears by the bills of lading, here in court produced, and made a part of this bill; that on said tenth day of February, said vessel set sail and departed from Appalachicola, in the state of Florida, bound for Boston aforesaid; that on the night of the first day of March then next ensuing, said vessel was in Massachusetts Bay, in a heavy gale, and was driven with great force and violence on to a rock, and, after striking for some time, beat over into deep water; that then both anchors were let go with about thirty fathoms of chain, when breakers were discovered under the stern; that said vessel rode at her anchors till daylight, dragging a little every time she struck,—at daylight it was discovered that said vessel was inside some of the Cohasset rocks, so called; that about nine o'clock a. m., said vessel commenced to drag and strike very heavily, when more chain was payed out to prevent her stern from striking on a rock; that said vessel was thrown with great force and violence on the rocks, beat over, and was exposed to the full fury of the sea, which struck heavily on her broadside; that said vessel was then, and the cargo on board of her, was also in imminent danger of being totally lost and destroyed by the action of the wind and sea; and that the master thereof, after consulting with his officers, deemed it expedient for the safety of said vessel and cargo and the lives of those on board, to slip the cables and run her ashore; that, accord-

ingly, the cables were slipped, and the vessel run ashore on to the beach. Your orators further allege that, afterwards, the cargo on board said vessel was safely landed and delivered to the said defendants respectively, and that the said vessel was afterwards got off, and the damage occasioned by her being so voluntarily stranded, repaired. Your orators further allege that said vessel, her freight and cargo, were in imminent danger, and would, in all probability, have been totally lost, if the cables had not been slipped, and said vessel run ashore as aforesaid; and that by the said voluntary stranding, the same were saved and preserved to the respective owners thereof. Your orators further allege that by the said voluntary stranding, great damage was done to said vessel, and heavy expenses incurred in consequence thereof, and in getting · her off and repairing said damages, and that the owners of said vessel are, entitled to demand and receive of the owners of her cargo their respective proportions of the damage, loss, and expenses so incurred,—the same being a sacrifice made and incurred by the owners of said vessel for the common benefit of the vessel, cargo, and freight, and all interested therein. Your orators further show that in consequence of the damage suffered by said vessel as aforesaid, the owners thereof abandoned the same to the said corporations, the insurers thereon, and that said corporations accepted said abandonments, and paid the sums by them respectively insured, and thereby became assignees of, and subrogated to, all the rights of the owners of said vessel, to demand and receive a contribution from the owners of the said cargo, for the damages, losses, and expenses so incurred for the general benefit. Your orators further show that on the thirtieth day of July last past, they caused to be prepared a general average adjustment, showing the amount of the losses, damages, and expenses incurred by reason of the said voluntary stranding, and of the apportionment thereof upon the said vessel, her cargo and freight, and the several owners thereof, and that by said adjustment it appeared that the said Thomas G. Cary ought to pay the sum of three thousand and seventy-two dollars and seventy-six cents; the said Pliny Cutler, the sum of thirteen hundred and sixty-eight dollars and sixty-nine cents; the said Goddard and Prichard, the sum of six hundred and seventy dollars and fifty-four cents; the said Charles H. Mills and Company, the sum of twenty-seven hundred and sixty-eight dollars and one cent; the said O. Eldredge and Company, the sum of eight hundred and thirteen dollars and thirty-eight cents; the said George Howe, the sum of twenty-three hundred and fifty-four dollars and twelve cents; and that the said William Amory is entitled to receive the sum of ninety-one dollars and ninety-nine cents, as will appear by reference to said adjustment, here in court to be produced, and said several defendants

were then respectively requested to pay the sums from them due as aforesaid."

The answer admitted: "That, as they are informed and believe, in the early part of March, said barque, in the course of her said voyage, was overtaken in Massachusetts Bay by a heavy gale or violent storm, accompanied with snow, by means of which she was in the night time driven with great force and violence upon, over, and into the midst of certain rocks, called the Cohasset rocks, on the coast of Massachusetts; that upon attempting ·to anchor her, whilst in this situation, it was found by those on board that her anchors would not hold, and after beating for some time upon the rocks, dragging her anchors, she was, by the violence of the storm, forced upon the shore and involuntarily stranded; that if, as alleged in said bill, her cables were slipped, of which these defendants are wholly ignorant except as informed by said bill, it was only, as they are informed and believe, when dragging her anchors, she was driving broadside on with great force and violence upon the rocks, and exposed to the full fury of the sea, and when it was ascertained, that she must inevitably be beaten to pieces upon the rocks or stranded by the irresistible force of the winds and waves. And these defendants wholly deny that the stranding of said vessel was, to the best of the information and belief of these defendants, in any degree the effect of the agency of her master and crew, and that any sacrifice was by them made of said vessel, for the sake of the cargo of these defendants on board, and aver that, from the aforesaid perils of the sea, said vessel was and would have been cast on shore or beat to pieces on the rocks and. wholly lost, notwithstanding all efforts of those on board, and, without the alleged act of slipping the cables attached to the anchors of said vessel, as stated in said bill. And these defendants admit that afterwards, said vessel, so involuntarily driven and forced on shore as aforesaid, was, as they are informed and believe, fortunately got off and repaired; and that the goods of these defendants laden on board said vessel, were landed and delivered to them respectively; but aver that a considerable portion of said goods was damaged, and their value thereby greatly impaired by the common perils and injuries to which they were subjected, as well as said vessel. And these defendants further admit, that on or about the thirtieth day of July last past, the complainants caused to be prepared a general average adjustment, showing the amount of the losses, damages, and expenses incurred by reason of the injury to, and repairs and getting off of said vessel, and ,f the apportionment thereof upon the said vessel, her cargo and freight, and the several owners thereof, and demanded of these defendants the several sums therein and in said bill set forth as the contributory shares of hese defendants respectively, to- wards said losses, damages, and expenses;

but whether said general average adjustment is upon the theory that these defendants, as owners of the said cargo, are bound to contribute to said losses, damage, and expenses, well and properly made up, these defendants do not know, being wholly ignorant of the value of said vessel and freight, the amount of said damages, losses, and expenses, and not being satisfied with the value affixed to their said cargo, or the allowance thereon made for sea-damage thereto; but these defendants then refused and now refuse to pay the whole or any part of the said sums then and now demanded of them, on the ground that said damage, losses, and expenses, were not incurred by any voluntary sacrifice of said vessel for the safety of their said goods on board her laden, but were occasioned remotely and immediately by the inevitable and irresistible force of the winds and waves."

The master, Christopher Fay, testified as follows:—"I was master of the bark Vernon, from Appalachicola to Boston, in February, 1853. We got into Massachusetts Bay on the last day of February. March first commenced with fresh breezes and snow. At two, p. m., made Nauset Beach, and run along the beach. At four, p. m., off Cape Cod, double reefed the topsails, and reefed the foresail, furled the mainsail and topgallant-sail. At five, p. m., Cape Cod light bore south-west, about seven miles distant. Steered west-north-west until ten, p. m., made a light bearing west-south-west, hauled up to north-west, but finding the water shoaling, hauled up north-by-west. Wind at this time hauling to the eastward, braced up sharp and commenced making sail, when broken water was seen on the lee bow; put the ship in stays, but she refused to come round. The topsails were braced sharp back, but before she got stern way on her she struck, and after striking for some time, beat over into deep water. Let go both anchors, and when thirty fathoms of chain was paid out, breakers were discovered under the stern. We rode until daylight, dragging a little every time she struck. At daylight, found we were inside of some of the Cohasset rocks; a ship ashore about two miles to the southward, and another to the eastward. At nine, a. m., the ship commenced to drag and strike very heavy; paid out on the chain, to keep her stern from striking on a rock. For the safety of the ship and cargo, and lives on board, slipped both chains, and let her come in on the beach. At eleven o'clock, I communicated with the shore. At noon, launched the life-boat overboard, and got a line from the ship to the shore, to land the crew, who kept watch on the beach all night. Previous to slipping the chains, the vessel was thrown with great force and violence on the rock, beat over, and lay exposed to the fury of the sea, striking heavily on her broadside; and fearing that if we held on in this position by her anchors, she would go to pieces, I concluded, after consulting with the officers, for the preservation of the cargo, vessel, and lives of all on board, to slip the chains and let her go on the beach. After procuring assistance from the shore, they proceeded to land and save the cargo and materials of the vessel. If I had held my anchors, the ship, in all human probability, would have gone to pieces. My judgment was, that by slipping my chains and making sail on the ship, we should probably be able to save ourselves, the ship's materials, and cargo. We had no pilot, and no opportunity of getting one. I had lights set, and set off rockets and blue lights several times during the night,—the signals usually used for pilots. I had no idea of saving the ship, but only the materials of her, at the time I slipped."

Interrogatory for defendants: Q. "How far were you from the beach when you slipped?" A. "I should judge five or six cables length from the beach. It was not blowing very heavy at the time, but there was every appearance it would. There was a heavy sea running, and the wind was right on shore. There was no way of getting out, either on one tack or the other. I consulted my officers; we slipped our cables between ten and eleven in the forenoon. I considered the vessel would be lost, whether we slipped or not. There were not many people on the beach,—only ten or twelve. We got ashore in our own boat. There was a vessel ashore each side of us. They called it Scituate Beach where we got ashore, to the southward of the Glades."

The testimony of the master was, in all particulars, confirmed by that of the mate.

Mr. Choate and F. C. Loring, for complainants.

Mr. Fletcher, contra.

CURTIS, Circuit Justice. This is a suit in equity, brought by the owners and underwriters of the bark Vernon, against the owners of the cargo of that vessel, to obtain from the latter contribution in general average. The material facts are, that the bark, having a cargo of cotton and other merchandise on board, belonging to the defendants, and bound to Boston, came into Massachusetts Bay, and on the night of the first day of March, 1853, in a heavy gale of wind got on to the Cohasset rocks, let go both anchors and rode till daylight, striking occasionally, and dragging a little every time she struck. In the morning the vessel began to strike more heavily, dragging at the same time, and soon after was thrown with great violence on a rock, beat over and lay exposed to the fury of the sea, striking heavily on her broadside; and the master, fearing that if the vessel held on by her anchors in that position, she must go to pieces, after consulting with his officers, concluded, for the preservation of the cargo and lives on board, to slip the chains, and let her go on

the beach. This was done, and the result was that. the vessel and cargo were both saved, though both were damaged, and a heavy expense incurred to get the vessel off.

These are the facts, as testified to by the master and mate, who are the only witnesses. And the question is. whether they present a case for contribution by the cargo, in general average?

The requisites of such a claim are, a common peril. a voluntary sacrifice to avert that peril, and present safety from that peril thereby attained. That a common peril was impending over this vessel and cargo, as well as the lives of those on board, cannot be doubted. The danger was, that the bark would beat to pieces on the rocks, while holding on by her anchors. And the sacrifice made was, to cast the vessel on the beach. This was voluntary, for the chains were purposely slipped, with the design to have the action and force of the sea drive the vessel ashore: which was done. There was, therefore. a voluntary sacrifice of the vessel, by casting her on the beach, and the cargo was thereby saved from the peril, then impending over it, of being washed out of the vessel when dashed to pieces on the rocks. It was argued that the vessel was dragging ashore when the cables were slipped; and that act only hastened the stranding, without in any manner modifying it; and that therefore this case was distinguishable from those in which the master, by making sail on his vessel, had selected a place of stranding. less dangerous than the mere action of the wind and sea would have carried the vessel upon. But this argument loses sight of the distinction between the peril of going to pieces, while holding on by the anchors among the rocks, and the peril of stranding on the beach. The vessel was dragging her anchors towards the shore; but she was also lying on her broadside among rocks, striking heavily, and exposed to the fury of the sea. Though dragging towards the shore, the danger was, that she would go to pieces before reaching it. This was the immediately impending peril; that of stranding on the beach was more remote, and practically it was very different, as the event proved This last peril the master elected to encounter, to avoid the first. It is quite true that the vessel, as well as the cargo, were in more danger of destruction, while at some distance from the shore, and beating on the rocks, than by going on the beach. And that, in some sense, it cannot be said the vessel was sacrificed, when she was relieved from the greater peril by being stranded. But in the sense in which this word is used in the law of general average, the stranding of the vessel was a sacrifice. The fact, that the peril impending over the ship and cargo would have destroyed both, if not averted, so far from being inconsistent with a claim of this kind, is a necessary prerequisite to the voluntary act of the mas-

ter; and what is denominated a sacrifice means. not that its subject is destroyed. or even subjected to a greater danger than it was already in, but that it is selected to suffer alone, and thus avert the common peril. In support of these views, it is necessary only to refer to the two cases of Columbian Ins Co. v. Ashby, 13 Pet. [38 U. S.] 331. and Barnard v. Adams, 10 How. [51 U. S.] 270. It is impossible to distinguish the first of these cases from that at bar. In that case, the vessel dragged her anchors in a gale, struck on a shoal, thumped so heavily that the vessel was in danger of going to pieces while holding on by her anchors, and the master slipped his cables and ran her ashore. The vessel was lost, the cargo saved. This was adjudged to be a case of general average contribution. The fact that the vessel was lost was urged in opposition to the claim. "Quia nihil contributur nisi salvâ nave." The court held otherwise. In the case at bar the vessel was saved; but the right to contribution does not depend on the amount of damage done by the stranding.

My opinion is, that the complainants have a claim for contribution, and no doubt is felt that there is jurisdiction in equity to enforce it. 1 Story, Eq. Jur. § 490; Abb. Shipp. 507; Doane v. Keating, 12 Leigh, 391.

[Reference was made to a master. and, upon the coming in of the report. one exception was taken, which was allowed. Case No. 13,573.]