SHOE *et al. v.* LOW MOOR IRON CO. OF VIRGINIA *et al.*

(*District Court, S. D. New York.* May 4, 1891.)

**GENERAL AVERAGE—VOLUNTARY STRANDING—NO BENEFIT—YORK-ANTWERP RULES.**

The schooner T., drawing 9 feet of water, and loaded with iron, in the gale of September, 1889, after parting her kedge and starboard anchor inside the Delaware breakwater, drifted in the trough of the sea, her port anchor not holding, till within 250 yards of the outer bar, near Lewes, when the master, to save life, cut the cable, and let the vessel run head on to the shore. She grounded on the outer bar, broached to, and became a total loss; but the cargo was partly saved. Upon a libel filed to recover upon a general average bond against the owners of the cargo, it appearing that when the cable was slipped the vessel would have drifted on the bar substantially in the same place within five minutes; that there was no reasonable probability that she would have sunk before reaching the bar, if the cable had not been cut; and that its only effect was to drive her upon the bar one or two minutes earlier; and that the object in cutting the cable was not to save the vessel or cargo, and that in fact it was of no benefit to either,—*held,* that no claim of general average arose, without reference to York-Antwerp rule 5.

In Admiralty. Libel to recover upon a general average bond.

*Wing, Shoudy & Putnam,* for libelants.

*Sydney Chubb,* for respondents.

BROWN, J. In the great gale of September 8, 9, and 10, 1889, some 30 vessels, which had taken refuge from the storm inside of the Delaware breakwater, went ashore between the breakwater and Lewes; among them, the libelants' schooner Major W. H. Tantum. The libelants claim that the case is one of voluntary stranding. The vessel proved a total loss, but the cargo was partially saved. A bond having been given by the cargo-owner to pay any amount found due on general average, this libel was filed to recover $2,939.03, the amount charged against the cargo by the average adjusters. So much of the cargo as was recovered by the salvors was forwarded to its destination. After the libel was filed a deposit was made by the respondents with the libelants' proctors of $1,350 and costs, which was received under a stipulation that the deposit should be deemed equivalent to the payment of so much money into court, not as general average, but as the whole expense for which the cargo was chargeable for salvage and for forwarding to the consignees. The respondents contend that the case is not one for any general average charge, and, after much consideration, I am of opinion that this contention should be upheld, on the ground that the facts, as I must find them upon the evidence, do not show (1) any voluntary act designed for the benefit of ship and cargo; nor (2) any such substantial sacrifice of the ship or benefit to the cargo as is necessary to sustain a general average charge. The main facts are as follows: The schooner hauled inside the breakwater, and came to anchor on September 8th, about three-quarters of a mile from the place of stranding. The wind was north-east, and increased in violence until the 10th. The schooner meantime had drifted somewhat to leeward, although the starboard and port anchors and the kedge had been successively put out with all available cable. At 6 A. M. on the 10th the kedge parted, and the vessel drifted further to lee-

ward until about 8 or 8:30 A. M., when she brought up again on the port and starboard anchors. At 4 P. M. the starboard chain parted, upon which the vessel's stem swung to the westward, and she lay in the trough of the sea drifting towards the beach, the port anchor not holding sufficiently to keep her head to the wind. In this situation the seas at times broke over her, and filled her decks with water, so that the cabin doors had to be kept closed, but the men were able to pass forward and aft. If while in that condition the hatches should have been broken in by the seas, as she was loaded with iron, she would have soon filled and sunk if she had not drifted ashore. Capt. Rudolph says that "if the hatches got off she would not live five minutes." But her hatches were not started, and she was already within five minutes of the bar. Nothing on deck was broken, but she was very near the outer bar; and if she grounded there, broadside to the seas, as she was then going, there was great danger that all on board would be lost. The master, therefore, for the purpose of saving life, and with no other motive, determined to slip the cable of the remaining anchor. This was speedily done in three fathoms of water, and the helm being put hard a-starboard, the vessel without canvas paid off to the southward, and in a few moments was blown upon the outer bar head on, where she grounded fast, after broaching to with head to the eastward, and became a total loss. Some 20 other light-draught vessels, in going ashore, passed over the outer bar, and ran high up on the beach some 200 yards further in, most of which were afterwards got off. A few others grounded outside of the Tantum. The master got aboard of a lighter draught vessel the same night, as she passed close to the stern of the Tantum in running over the bar. The rest of the crew were rescued from the Tantum the next morning. The master testified that he slipped his cable about half way from the light to the place of grounding, which would be a half mile from the latter. But he buoyed the cable at the time it was slipped, and the testimony of the persons who afterwards recovered it leaves no doubt that it was not over 200 or 250 yards from the place where the Tantum grounded. This serious error, if not intentional misrepresentation, on a most important point detracts greatly from the weight to be given to the master's testimony in other respects. In running ashore it was no doubt the object of the master to get as far as possible up the beach, and for this purpose he would naturally have set all possible canvas. None was set because, as he says, there was not time to set any, which shows that the interval between slipping the cable and grounding was very short. It is further evident that at the time when the cable was slipped the anchor was of little or no use, and that the schooner was drifting ashore fast. If the anchor had held, the vessel's head, as the master himself testifies, would have been kept more to the wind, and not have fallen off to the westward in the trough of the sea. Mr. Hammond, one of the libelants' witnesses, in answering an inquiry as to the justification of the master in slipping the cable under such circumstances, testified: "But the vessel that would be thwart-hawsed swinging to anchor and chain, she would have to be dragging very fast that she can't make the wind." As the

Tantum at the time when the cable was slipped was not over 250 yards from the place of grounding, and was drifting ashore very fast, the necessary inference of fact is (unless there was danger of instant sinking, which cannot be admitted for the reasons stated below) that, had the cable not been slipped, she would have grounded in four or five minutes substantially in the same place, under the same conditions, and with the same result to the cargo; and that the only effect of slipping the cable, no canvas being set, was to let her drift upon the bar perhaps a couple of minutes earlier than she would otherwise have done, and with head to the eastward instead of to the westward; an act, therefore, wholly without benefit to the cargo. This view accords entirely with the master's testimony as to his purpose in slipping the anchor; for he nowhere states in the direct examination or cross-examination that his object was to save either the vessel or the cargo, or that he supposed his act could make any difference as regards the safety of either. The only object he states was to save their lives. When the small chain parted he said to the mate:

"We have got to do something. We will drown here. *Question.* You mean the starboard anchor? *Answer.* Yes; by our getting into the trough of the sea, I was afraid of her foundering there, and drowning all hands. I buoyed the anchor, and slipped the chain myself. *Q.* Why did you at that time slip the chain? *A.* Why, to save our lives. * * * *Q.* Supposing you had remained, and the chain had held, what do you think would have been the effect? *A.* Well, we would have foundered right there. * * * *Q.* In your judgment, was it best, then, to slip the chain? *A.* Yes, sir. * * * *Q.* You were dragging so fast it [the remaining anchor] would not hold you up,—you were dragging broadside on? *A.* Yes, sir."

The master's protest contains the following:

"At 4 P. M. the chain of the small anchor parted. The mountainous seas that were running were breaking on board; the vessel, being unmanageable, got into the trough of the sea, and commenced to founder."

By the latter expression he says he meant that "her decks were full of water, and would have washed the houses off if we had stopped there;" which is a totally different thing. To these surmises of the master as to what might have happened, as he now states them, I cannot give much weight, because of his evident exaggerations, and because his testimony is not consistent or intelligible as it stands. How could the vessel "stop" in 18 feet of water unless the anchor should hold? And in that case, as he himself says, she would have come head to the wind; and then she would have ridden safely, as before. The only danger, as he himself states it, was from drifting in the trough of the sea, and her approach to the shore. There is no suggestion of any danger from the seas while her anchor held. If her anchor should have held, and she should have "stopped there," *i. e.*, in three fathoms of water,—she would not have been in any immediate danger, and would doubtless have ridden out the storm. The evidence quoted, therefore, proves nothing to the purpose. The vessel did not "begin to founder" before the cable was slipped, as the protest intimates. None of the hatches were in fact broken, washed off, or started, before grounding; and she did not "stop" till she reached the outer bar,

though that was then very near. I cannot find any consistent interpretation for this part of the captain's testimony, as it stands. What he meant probably was that if the vessel stopped by grounding in that vicinity—*i. e.*, on the outer bar, broadside to the seas—all would probably lose their lives; and he therefore cut the cable in order to run the vessel ashore head on, and, if possible, over the outer bar to the beach beyond. He did not succeed in either. The vessel grounded where he feared she would ground, and broached to precisely as she would have done two or three minutes later if the cable had not been cut. His testimony on this subject is so conditioned and qualified that I cannot find that when he slipped the cable there was the smallest probability that the vessel would founder just where she then was, or before she would have reached the bar, or that the master thought so. Up to that moment not a thing on deck had been carried away or broken; nor was the danger any other than that she might stop and founder, broadside to the sea, on the outer bar, which was then very near, and would be very soon reached. That danger was imminent and pressing. To save life the master rightly did all he could to avert it by trying, though unsuccessfully, to run over the bar. His act proved of no use to ship or cargo.

Such facts do not give rise to any claim of general average. The three necessary elements of motive, sacrifice, and benefit to cargo are alike wanting. The adjudications in the federal courts of this country, which are most favorable to a general average, fall far short of sustaining it in a case like this. In the cases most nearly analogous, viz., those of *The Julia*, (*Caze* v. *Reilly*,) 3 Wash. C. C. 298; *The W. Sims*, (*Sims* v. *Gurney*,) 4 Bin. 513; *The Brutus*, (*Barnard* v. *Adams*,) 10 How. 270; *The Star of Hope*, 9 Wall. 203; and *The Vernon*, (*Sturgess* v. *Cary*,) 2 Curt. 59,— the vessels were deliberately run ashore under sail for the purpose of saving the cargo, and the ship also, if possible. The Brutus and the Sims were thus run several miles after their cables had parted. And in the case of *The Hope*, (*Insurance Co.* v. *Asby*,) 13 Pet. 332, the special verdict found that the vessel was run ashore "for the safety of the crew and the preservation of the vessel and cargo." The Brutus and the Vernon were sailed away from rocks to strand upon an even beach. In the case of *The Oneiza*, (*Rathbone* v. *Fowler*,) 6 Blatchf. 294, 12 Wall. 102, the ship was run upon an uneven shore, and exposed to greater peril by straining, for the sake of saving the cargo. In all these cases there was great benefit to the cargo through the sacrifice of the ship, and such was the purpose of the stranding. In *The Star of Hope*, 9 Wall. 232, Mr. Justice CLIFFORD says:

"Undoubtedly the sacrifice must be voluntary, and must have been intended as a means of saving the remaining property of the adventure and the lives of those on board; and unless such was the purpose of the act, it gives no claim to contribution."

And the whole ground and equity of general average rest upon substantial benefit to what is saved. Here the voluntary act was of no benefit to the ship or cargo. The law of this country, as laid down in the case of *Barnard* v. *Adams*, *supra*, is doubtless more liberal than that of

most countries in favor of general average in cases of voluntary stranding. The weight of opinion among men interested in maritime affairs as to the best practical rule on this subject has doubtless been embodied in the York-Antwerp rules, which for a quarter of a century have disallowed a general average upon a voluntary stranding where at the time when the stranding was determined on the vessel must in any event have been lost. This rule, (5,) as revised in the conference of 1890, is as follows:

" When a ship is intentionally run on shore, and the circumstances are such that, if that course were not adopted she would inevitably sink, or drive on shore or on rocks, no loss or damage caused to the ship, cargo, and freight, or any of them, by such intentional running on shore shall be made good as general average. But in all other cases where a ship is intentionally run on shore for the common safety the consequent loss or damage shall be allowed as general average."

This rule accords largely with the continental law. See Valroger, Droit Mar. §§ 2220, 2223; 4 Desjardins, Droit Mar. §§ 978–1004; 6 Rev. Inter. Droit Mar. pp. 340, 352. Though our own law is different, nothing in it sustains a general average except upon a voluntary sacrifice designed for and resulting in substantial benefit. For the lack of these elements the libelants are entitled to recover no more than provided by the stipulation, and the respondents are entitled to the subsequent costs.